(No. 10872.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHARLES MURPHY, Plaintiff in Error.

*Opinion filed December 21, 1916.*

1. CRIMINAL LAW—*when prejudice in county seat will not prevent securing an impartial jury from entire county.* Even if it be proved that there is great prejudice, through the publication of newspapers and other causes, against the defendant in the county seat of the county where the crime was committed, if it appears that in the remainder of the county there is no prejudice there can be no reasonable apprehension that the defendant cannot obtain a fair and impartial trial in said county. .

2. SAME—*what question is to be determined on petition for a change of venue alleging prejudice of inhabitants.* The real question to be determined on a petition for a change of venue alleging prejudice of the inhabitants against the defendant is not whether the evidentiary facts in the petition are proved, but whether, from all the evidence admitted, there is reasonable ground for fear that the alleged prejudice actually exists and that the defendant will not receive a fair and impartial trial.

3. SAME—*interpreter in a criminal case not disqualified because he is a police officer.* One is not disqualified to act as interpreter in a criminal trial because he is a police officer in the county seat of the county where the crime was committed.

4. SAME—*what does not show that the interpreter was unfair.* Where two defendants are being tried for murder and a Greek witness for the People, testifying in his own language, refers to one defendant by the Greek term for "big man" and to the other by the Greek term for "little man," the fact that the interpreter, instead of translating literally, uses the names of the respective defendants, does not show that his interpretation was unfair, where the evidence clearly shows that one defendant was a large man and the other a small one and that they had been positively identified by the witness.

5. SAME—*when evidence relating to killing of one man is admissible on trial for murder of another.* On the trial of two defendants for the murder of one of the two victims who were killed in the same assault, evidence in reference to the killing of one victim which is inseparable from the evidence in relation to the killing of the other is admissible as a part of the *res gestæ.*

6. SAME—*fact that experiment was made in absence of accused goes only to the weight of the evidence.* Proof of an experiment

showing that the handle of a revolver found in the possession of the accused fitted exactly into the wound on the head of one of the two victims of the same assault is admissible on the trial for the murder of the other victim, who was killed by a bullet from such revolver; and the fact that the experiment was made in the absence of the accused goes only to the weight of the evidence.

7. SAME—*what reference by State's attorney to Parole law is improper.* In a murder trial, where the State's attorney is arguing for the imposition of the death penalty, it is improper for him to state that the Parole law turns criminals out of the penitentiary as fast as they get there.

8. SAME—*when judgment in criminal case will not be reversed.* The Supreme Court will not reverse a judgment of conviction merely because error has been committed, unless it appears that real justice has been denied thereby or that the verdict of the jury or the judgment of the court may have resulted from such error.

WRIT OF ERROR to the Circuit Court of Vermilion county; the Hon. WALTER BREWER, Judge, presiding.

OLIVER D. MANN, for plaintiff in error.

P. J. LUCEY, Attorney General, JOHN H. LEWMAN, State's Attorney, and C. H. LINSCOTT, for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error and Milton Armstrong were convicted of murder in the circuit court of Vermilion county on two separate indictments. The first charged them with the murder of George Roumas, and they were each sentenced on the verdict in that case for a term of ninety-nine years. The second indictment charged them with the murder of Louis Roumas, and in that case Milton Armstrong's punishment was fixed at ninety-nine years in the penitentiary and the sentence of plaintiff in error was the death penalty. This writ of error is prosecuted to have reviewed the judgment of the court in the latter case.

The facts proven in this case are substantially as follows: On November 9, 1915, four Greek brothers, Tom,

John, George and Louis Roumas, were working for a railroad company and were living in a bunk-car at Hillery, a small station on the Peoria division of the Big Four railroad in said county, a few miles west of Danville. The car was a freight box-car that had been taken off its trucks and set upon the ground, with its ends facing, respectively, the east and the west. In the middle of the south side of the car was a door that opened into the car, and the interior of the car was divided by a partition just west of the door. A door in the partition opened from the west room of the car. On that night the Greeks went to bed between nine and ten o'clock. Tom Roumas was sleeping on a bed in the southeast corner of the east room of the car, his head to the east, and there was no light in that room. John and George Roumas occupied a bed in the west end of the west room of the car. Their heads were to the south. Louis Roumas occupied a bed just west of the partition and on the north side of the west room. His head was to the west. A lighted lamp hung on the south wall of the west room, about five feet from the floor and about three feet from the bed in the west end of the room. A stove with fire in it was in the southeast corner of the west room, the door of which was open. The outside door was fastened on the inside with a bolt-latch. Shortly after the Roumas brothers had gone to bed the south door of the car was forced open by two negroes, plaintiff in error and Milton Armstrong. Plaintiff in error was armed with a blue-steel revolver in one hand and had in the other a large flashlight and went to the bed where Tom was asleep in the east room. He pointed the revolver at Tom's head and forced him to go into the west room, where Armstrong had gone armed with a nickel-plated revolver and a small flashlight. George and John had already gotten out of bed by order of Armstrong and were facing him with their hands up. Tom was then placed close to George and John, and all three of them had their hands up, facing the two negroes, who were standing

near the door in the partition, covering the Greeks with their revolvers. George asked what they wanted. Plaintiff in error then held his flashlight near Louis' face, who was lying upon the bed. Louis rose up and sat with his hands on his chin. He made a movement with his hand and plaintiff in error immediately shot him twice. One of the bullets went through his head and the other struck him in the side, and he fell dead between the bed and the partition. George then grabbed plaintiff in error by the hand and the wrist. They wrestled and scuffled with each other through the partition door and finally out through the south door onto the ground. John and Tom during this time were looking after Louis, whom they found to be dead, and while over his body they heard someone in the other room of the car say, "Shoot, Murphy!" Tom and John did not see what took place outside of the car but heard three shots, and in a short while they went out and found George outside on the ground near the car, dead, and then gave the alarm.

The foregoing facts were testified to by John and Tom Roumas. They were very positive in their identification of plaintiff in error, whom the evidence shows to be a large man, and also positively identified Armstrong, whom the evidence shows to be a much smaller man. They also testified that two revolvers and two flashlights exhibited in evidence were the same revolvers and flashlights used on that night by Murphy and Armstrong or just like them.

The testimony of the two Greeks was corroborated by a number of witnesses who saw Murphy in Hillery or in the vicinity of the bunk-car the afternoon of the murder. Plez Hubbard testified that he saw him get off of a car-load of logs with another man as the train pulled into Hillery and that he waved his hand at Murphy. D. J. Spitz, a conductor of the Big Four railroad, testified that he made the trip on a freight train from Urbana to Indianapolis, arriving at Hillery, going east, at 1:13 o'clock P. M., and had a car-

load of logs in his train, but could not recall that anyone· got off his train at Hillery. Gladys Miller and Clay Bid-· dle identified plaintiff in error as the colored man that they saw in Batestown that afternoon within a few hundred yards of the bunk-car. Lovina Pollock and Charles Gaw testified that they saw him the same afternoon in the same vicinity and talked with him.

Jordan Johnson, deputy sheriff of Champaign county, arrested Murphy and Armstrong on the night of November 10, 1915, at William Higgason's house, in Champaign. When Johnson flashed a light on the bed where Murphy and Armstrong were sleeping, Murphy jumped up and started for his gun but Johnson "beat him to it." · Johnson and E. V. Buckler, the officer accompanying him, found on a box near the bed a nickel-plated revolver, a shoulder holster and a large and small flashlight, and found a large blue-steel revolver under their pillow. They also obtained from Murphy's pockets thirteen Smith & Wesson cartridges of .38 caliber, some of which had soft-pointed bullets and the remainder of them steel-jacketed bullets, all of which articles were made exhibits in the case and identified by the officers as the articles taken with the prisoners. The blue-steel revolver was loaded, when taken, with soft-pointed bullets of .38 caliber, and the barrel was slightly bent and the revolver had been thoroughly cleaned and oiled. The nickel-plated revolver was loaded, when taken by the officers, with steel-jacketed bullets of .38 caliber. Two steel-jacketed bullets of .38 caliber were found on the scene of the murder,—one near the body of George Roumas and one in the car near the body of Louis Roumas, the latter bullet being shown to have been one fired at Louis Roumas, both of which were exhibits on the trial.

Ora Calvin, a pawnbroker doing business in Champaign in November, 1915, and prior thereto, knew Murphy, and testified that Murphy pawned to him the blue-steel revolver in evidence October 12, 1915, for money borrowed by

Murphy, redeemed it October 25, again pawned it October 28, and again redeemed it November 8, 1915, the day before the killing of the two Greeks. He also testified that the barrel of the gun was not bent when it was pledged to him, and that it would shoot steel-jacketed bullets or "soft-nosed" bullets. On cross-examination he stated that it was possible that the gun was bent when he had it, but that he did not think it was.

William Higgason testified that Armstrong came to his house in Champaign about four o'clock A. M., November 10, 1915, asked him to make a fire, and said he did not know where Murphy was but that he would be there soon; that when he got up that morning Murphy and Armstrong were sitting in his kitchen; that he saw Murphy that evening cut out of a copy of the *Urbana Courier* an article headed, "Robbers murder Big Four men!" and roll it up and throw it in the cook stove; that Murphy and Armstrong told him that night that they had intended to go away but had changed their minds; that they slept that night at his house until arrested, and that Armstrong had never stayed all night at his house previous to that night but Murphy had stayed there for three or four weeks. He further testified that while the officers were knocking for admission to his house Armstrong burned up a black cap and a "flour sack with holes in it;" that he had seen Murphy with the blue-steel revolver and the holster in evidence "off and on" all last summer, and that on November 9, 1915, between 12 and 12:30 o'clock P. M., he saw Murphy and Armstrong about one hundred feet west of Hopkins' restaurant, in Champaign, and spoke to them, and that they replied, "How do you do? We are gone;" that they then turned west on Wright street, towards the Big Four tracks. The evidence further shows that it is a mile and a quarter along the railroad track from Hopkins' restaurant on the Big Four to the Big Four shops in Urbana. The Big Four runs from Urbana east to Hillery and Danville.

Sherman Hopkins testified that Murphy and Armstrong left his restaurant between ten and eleven o'clock A. M. the day of the murder, November 9, 1915, and that they had two caps, some flour sacks and other articles wrapped up in two packages, and that Murphy was not at his restaurant that afternoon; that they said they had a job and were going to Danville, and that Murphy had a blue-steel revolver in a holster and Armstrong a nickel-plated revolver in his pocket. The evidence showed that the freight train on the Big Four, with D. J. Spitz as conductor, left Urbana east bound at twelve o'clock noon that day.

By the evidence of John F. Gilmore, the undertaker, Dr. J. G. Fisher, W. D. Smith and Henry J. Sloan, deputy State fire marshal, the People proved that the inside of the butt of the blue-steel revolver was broken off, and that that part of the revolver fitted exactly into a deep wound in the hair line at the top of the forehead of George Roumas at the same time that the trigger guard thereof was resting in a smaller wound near his left eyebrow, and that the butt of the revolver and the guard fitted perfectly into those wounds at the same time; that the revolver was then in the same condition it was when they testified, and that the wounds were of the same size and in the same condition they were when the body was removed from the car, except that the wounds had been cleaned.

J. D. Mann, a prisoner in the county jail charged with swindling by means of the confidence game, testified that Murphy said to him in jail: "I am in a bad jam here; will you help me out? If I don't get out of it I am going to get 'topped;' I killed one of the Greeks; Armstrong killed the other;" that Murphy asked him to go to see a man in Mattoon by the name of Jack Jacobs and to Champaign and see Armstrong, Higgason and Jenkins; that he only saw one,—Jenkins; that Murphy wanted him to get some saws and guns, and that witness had previously told Murphy that he expected to get out of jail in a few days.

Plaintiff in error testified and denied *in toto* the facts sworn to by the Greeks. He also testified that he did not know where Hillery was and that he was never there or stopped there so far as he knew, and that he had never seen Lovina Pollock, Gladys Miller or Clay Biddle before they testified, and denied having the two packages in Hopkins' restaurant or elsewhere containing the caps and flour sacks, and denied telling Hopkins that he was going to Danville. He stated that he bent his blue-steel revolver in August, 1915, prying open a car on the Milwaukee and St. Paul railroad to get in out of the rain. He sought to establish an alibi, and testified that on the morning of November 9, 1915, he opened up Hopkins' restaurant about seven o'clock and served some early customers; that he was there again at 12:30 P. M. and at three o'clock that afternoon but was not there from eleven until one o'clock that day; that he left that restaurant between twelve and one o'clock and went down on Freemont street, in Champaign, but that no one left with him; that he saw Robert Ewing at his house in Champaign about eleven o'clock A. M., and was at Anna Long's and Robert Ewing's that afternoon at about 4:15 o'clock and saw Ewing's wife and Cordelia Walls and stayed there about twenty-five minutes; that he could not say just where he went from there; that about seven o'clock P. M. he was again at Mrs. Long's and stopped a few minutes to read the evening paper; that he then went over to the railroad track and sat down there with three or four fellows and stayed there until eleven o'clock that night; that he then broke into the grocery store of A. E. Moran and took therefrom a fifty-pound bag of flour, a side of smoked bacon, four quarts of peaches and four or five pounds of sugar, pried loose from the counter the money drawer and left it on the floor, and carried the stolen articles to Fourth and Vine streets, in Champaign; that he there got blocked by a freight train, got scared and put the stolen stuff in a box-car standing on the track; that he then

went back to "where he was before," where he had built
a fire, sat there until five o'clock A. M., and then went to
Bill Higgason's house and there saw Higgason and Arm-
strong.   On cross-examination he admitted that he had
previously testified at the city hall, in the presence of a
number of persons, that he was at Hopkins' restaurant from
eleven o'clock in the forenoon of that day until one o'clock
P. M., and that he might have stated that he was at Anna
Long's from one o'clock until five o'clock in the afternoon;
that about five o'clock he went to the "jungles" and took
some boys with him, and might have given at the other
trial as his reason for going there that he wanted to keep
out of sight.   He further stated that he had a flashlight
when he broke into Moran's store and that the small flash-
light in evidence was his but could not say about the large
one; that he had a nickel-plated revolver and holster like
the ones in evidence and also a blue-steel revolver similar
to the one in evidence but did not know whether they were
his or not.   He also denied telling J. D. Mann in jail that
he had killed one of the Greeks and that Armstrong killed
the other, and stated that he had never said anything to
him about killing any Greeks.   He denied that he had told
Mann anything about a man by the name of Niblack over
in Champaign, but admitted that he saw Mann in jail and
talked to him about a man by the name of Jacobs in Mat-
toon, and also one by the name of Charley Jenkins, but
failed to state what he said to Mann about them.   He fur-
ther testified that he was not out of Champaign at any
time on the day of the killing and was not with Armstrong
at all on that night, and never used steel-jacketed bullets in
his revolver but used soft-nosed bullets, .38 caliber.

Armstrong testified that he was not in Hillery on the
day of the killing and had nothing to do with the killing
of the two Greeks, or either of them; that he was at Hop-
kins' restaurant about 12:30 o'clock P. M. the day of the
murders and saw Murphy there, and that he went from

there to Mrs. Grant's house and thence home, and got home before one o'clock and was not outside of Champaign that day. He admitted that he was at Higgason's about 4:30 o'clock A. M. of November, 1915, and that Murphy came there that morning, but denied that he told Higgason to build a fire or that Murphy said make a fire.

The only other testimony offered by plaintiff in error in corroboration of his evidence was (1) that of A. E. Moran, who testified that his store was burglarized, his cash drawer found on the floor, and such articles as Murphy named were stolen from his store, but he could not tell the night or the hour of the night the burglary occurred; (2) that of Robert Ewing that he had known Murphy about eight years, and saw him about eleven o'clock that morning in Champaign and about 4:30 o'clock that afternoon at his home but could not say which way he left, and fixes the date by his brother-in-law's death, which occurred that day; ·(3) that of Cordelia Walls that she saw Murphy a little after four o'clock in Robert Ewing's yard playing with the dog, and the date was fixed in her mind by the death of her husband that day; and (4) that of Anna Long that she had known Murphy since "last spring;" that she saw him "off and on all day;" that she saw him about three o'clock that afternoon, and the last time she saw him was at her house in Champaign about half-past seven or eight o'clock that evening; that he came into the house and asked to see the evening paper, saw it, thanked her and left. She was contradicted in rebuttal by two witnesses, Jordan Johnson and Charles Vandervoort, who testified that she stated at her home on November 11, 1915, that Murphy came to her door in the evening of November 9, 1915, but did not go into her house.

The testimony in rebuttal showed that trains on the Illinois Traction System run from Danville and Hillery to Champaign, and on November 9, 1915, a train on that road left Hillery at 11 P. M. and arrived in Champaign at 12:30

A. M., November 10; that a freight train on the Big Four, west-bound, left Hillery at 11:40 that night and got into the Urbana yards at 2:35 A. M., November 10.

The foregoing is substantially the entire evidence in the case. It will require no argument to convince the mind of any reasonable man that the plaintiff in error is guilty of the murder of Louis Roumas beyond all reasonable doubt. Both the positive and circumstantial evidence for the People point strongly and with certainty to his guilt, and the only escape from that conclusion would be in a finding that the State's witnesses, or many of them, have committed willful perjury in giving their testimony. Plaintiff in error failed utterly to establish his alibi,—that is, that he was not in Hillery when the murders were committed,— by his witnesses offered to corroborate his own testimony. Their evidence only tends to show that he was in Champaign up to eight o'clock P. M. that day, while the murders were shown to have been committed after nine o'clock that night. It was entirely possible for him to have gone to Hillery after that time, have participated in the murders, have returned to Champaign and burglarized the store of Moran, and have gotten to Higgason's before five o'clock the next morning, where he met Armstrong. His own testimony was contradictory and very unsatisfactory and very damaging to him. It has many earmarks of a fabricated story, and undoubtedly tended strongly to condemn him in the minds of the jury and to convince them that it was untrue. We do not see how plaintiff in error could reasonably expect a more favorable verdict for a defendant clearly proven guilty of so foul a murder, and we cannot legally reverse the judgment unless the record should disclose some serious error committed by the trial court that would have a tendency to unduly prejudice him with the jury.

Prior to the commencement of the trial in this case plaintiff in error filed a verified petition for a change of

venue to some other county, except Champaign county, on account of the prejudice of the inhabitants of Vermilion county, setting forth, in substance, that the indictments were returned against him January 28, 1916; that the first verdict was returned against him February 26, and a motion for a new trial was pending when the State's attorney gave notice that he desired to have the second case set for trial; that there was great horror expressed in the newspapers of the county over the tragedies committed at the bunk-car in the killing of the Greeks; that during the first trial the *Commercial News* and the *Danville Morning Press,* newspapers of ten thousand circulation or more, published flaming headlines in giving accounts of the trial, such as, "Brother is not frightened by negro," "Survivor of bunk-house shooting behaved well on witness stand," "Murder evidence most damaging," "William Higgason testified that defendant admitted killing of two Greeks," "Murphy gets nervous," etc., which headlines were accompanied by full accounts of the testimony of the State's witnesses while only a few words or sentences were devoted to the detailing of the evidence for plaintiff in error, and that in many instances the evidence was different from the evidence given on the trial, to defendants' prejudice; that the argument of the State's attorney to the jury was published in the paper at great length, with the statement that he made a great speech and repeatedly demanded the lives of the two prisoners; that after the verdict was rendered there was printed across the front page of one of the papers, "Murphy and Armstrong get ninety-nine years," and that the papers and said printed matter were distributed over the county by the sending out of more than ten thousand copies thereof; that owing to said facts the prejudice of the people waiting to hear the verdict was so great that it was feared by the officers, including the judge, that if the jury should bring in a verdict of not guilty there might be an attempt made to lynch the defendants; that judging from those

facts a general "underground" prejudice has arisen against Murphy since February 20, 1916, and that there is no person of sufficient intelligence to serve upon the jury who has not a fixed opinion as to his guilt and as to what the verdict should be, and that a great many people are demanding that he be hung without regard to the evidence; that he is convinced that no jury can be secured in the county that would give him the presumption of innocence, and that he fears and believes that he will not receive a fair and impartial trial in Vermilion county.

In support of said petition there was filed an affidavit of Charles R. Shannon that he was employed as counsel for the defendants and interviewed one hundred and twenty-five citizens of Danville; that he secured from twenty-five of those citizens twenty-five affidavits, and that eighty of the one hundred and twenty-five said that they felt that defendants could get as fair trial as they deserved, considering the crime they committed, as they felt that both should be hung and that the jury erred in not so finding, and that the ten others made no comment. The substance of each one of the twenty-five affidavits so referred to and filed in this cause is, that affiant is a resident of the town of Danville, and that he believes that Charles Murphy, one of the defendants in said cause, cannot receive a fair and impartial trial in the circuit court of Vermilion county because the inhabitants thereof are prejudiced against him, and that the prejudice has arisen since February 20.

Oliver D. Mann, his counsel, filed in support of said petition his affidavit, setting forth, in substance, that he appeared as counsel in the first trial and that during that trial it became apparent to him that there existed such a prejudice against the defendants that it would be impossible to secure a jury in the county of sufficient intelligence to act as jurors who would start with a presumption in their minds that the defendants were innocent and who had not formed some opinion as to their guilt which will require evidence

to remove; that he talked with about fifty citizens of Danville who said to him that defendants ought to be hung and that he had done well to save their necks; that a large number of people had said to him that it was time there was a hanging in Vermilion county and that they were disappointed that it did not take place; that he interviewed several people from the towns surrounding Danville, and that they were unanimous in expressing the sentiment that the defendants ought to be hung; that he believes that the defendants cannot secure a fair trial, and as a further basis therefor states that after the trial of said defendants for the killing of George Roumas, after the jury retired, certain officers of the court expressed fear that should the jury bring in a verdict of not guilty the defendants would be lynched, and that just before the jury rendered their verdict he was requested by the officers to say nothing, as they feared the outcome in case the verdict should be favorable to the defendants; that on Saturday, March 2, 1916, there was published in one of the newspapers a purported statement from Lewman, State's attorney, "I see no use of going to the expense of trying these men elsewhere;" that affiant believes that that statement caused many people to make affidavits in support of the People's denial of the affidavits for change of venue.

The State's attorney filed an answer to the said petition, and denied that the inhabitants of Vermilion county were prejudiced against plaintiff in error and denied the statement that he could not obtain a fair and impartial trial; averred that the statements made in the petition were based upon hearsay evidence and were without foundation in fact, and that it was not true that the sentiment of the people of the county had become worked up to an "intense pitch" against him; also averred that the statement that it was feared by the officers of the court, and the court itself, that if a verdict of not guilty were returned there might be an attempt to lynch defendants was without any basis and is

false, and further averred that Murphy could and would receive a fair and impartial trial in the circuit court of Vermilion county. The answer was supported by the affidavit of the State's attorney. The answer was further supported by four special affidavits by Charles M. Crayton, Charles W. Wortman, Charles W. Fleming and James R. Juvinall, all members of the Vermilion county bar. It was stated in each of said affidavits that since the first trial of the defendants they had talked to many persons of Vermilion county, residing in all parts of it, about said case and about the charge contained in the indictment, and that none of them expressed any bias or prejudice against the defendants, and only a very few of them knew the deceased or ever heard of him before his death; that the men they interviewed were from all walks of life, and that from those statements there is no prejudice in the minds of the inhabitants of Vermilion county against either of said defendants, and that in their judgment no reasonable apprehension exists why said defendants cannot get a fair and impartial trial in that county; that the deceased was a Greek railroad laborer, known only to a few persons living in said county. Affiants Crayton and Fleming, as shown by their affidavits, had interviews with one hundred men or more, Juvinall with three hundred or more, and Wortman with five hundred or more. The answer was also supported by over 1700 affidavits from representative citizens of all classes from every town in the county, in all of which the affiants state that they had talked to many citizens of their respective towns; that they found a few persons who had heard the former trial of plaintiff in error; that none of them had ever heard any person say he had any feeling or prejudice against him, and never had heard any person say that he could not get a fair and impartial trial; that affiants had familiarized themselves with the sentiment of the people of their respective towns and that there was no prejudice among the inhabitants of said towns against Murphy, and

all of them expressed the belief that there was no such prejudice and that he could have a fair and impartial trial in said county.

The court is well supported by the record, as above shown, in its finding that there was no such prejudice against plaintiff in error as would prevent him from receiving a fair and impartial trial in Vermilion county. Nearly the entire investigations of attorneys for plaintiff in error were confined to the citizens of Danville, upon which they based their judgment as to the existence of prejudice against him. Plaintiff in error had little or no acquaintance in the county and had no opportunity to make an investigation. His affidavit is necessarily based upon hearsay, largely. All the other twenty-five affidavits supporting the petition are shown to be made by citizens of Danville. The evidence in support of the answer comes from all parts of the county, and by men representing all classes of citizens and all kinds of business conducted in the county. Even if it be proved that there was great prejudice in the town of Danville against plaintiff in error, and that it was caused by the publication of the newspapers and other causes set forth in the petition, still, if in the remainder of the county there remained no prejudice against him, as is thoroughly shown, there could be no reasonable apprehension that he could not obtain a fair and impartial trial in said county. By the affidavits in the record it appears that Vermilion county is forty-two miles long north and south and twenty-three miles wide east and west and has a population of more than 90,000, while Danville has a population of approximately 30,000 and contains perhaps not over one-fifteenth of the entire territory of the county. The real question to be determined on such a petition is not whether or not the evidentiary facts in the petition are proved, but whether, upon all the evidence admitted, there is reasonable ground for fear that the alleged prejudice actually exists and that the defendant will not receive a fair and impartial trial. (*Jami-*

*son* v. *People,* 145 Ill. 357.) When all the affidavits are considered we are satisfied that there was no such general prejudice prevalent in Vermilion county as would be likely to prevent or interfere with the due administration of justice. It further appears from the record that a jury was selected and sworn on the first day of the trial, and it furnishes no complaint or showing whatever that any of the jurors taken or examined had any prejudice against plaintiff in error.

Peter Docoons was objected to by plaintiff in error as an interpreter on the ground that he was an officer of the Danville city police. That fact did not disqualify him as an interpreter. This court has held that even a witness in a case or a relative of the prosecutrix is not disqualified as an interpreter on those grounds, alone. (*Chicago and Alton Railroad Co.* v. *Shenk,* 131 Ill. 283; *People* v. *Rardin,* 255 id. 9.) Besides, the court continued the case until 1:30 o'clock in the afternoon for the defense to produce an interpreter. When the court re-convened it was informed by Murphy's counsel that their interpreter had gone away and that they would have to go on without him, and thereby waived their objection.

The contention that the interpreter was unfair is not borne out by the record. One of the Greek witnesses, in answer to a question as to which side of the partition his bed was on that night, merely pointed to the west. The interpreter answered for him, "It was on the west side." In answer to the question, "Where who held his gun?" the witness answered in Greek, "Megalos," meaning the big man. The interpreter interpreted and answered, "Defendant Murphy." In like manner the witness, in referring to Armstrong, used the Greek word "Mikros," meaning the little man, and the interpreter answered, "Defendant Armstrong." While the interpretations were not literal, the answers of the interpreter and the witness amounted to one and the same thing, as the evidence clearly shows that Mur-

phy was a big man and Armstrong a small man and that the witness actually referred to them in those terms. The court was at no time asked to dismiss the interpreter or to substitute another. It does not appear that the interpreter was intentionally unfair, or that his interpretations were, in fact, unfair to the plaintiff in error.

Complaint is made that the court erred in limiting the cross-examination of two of the State's witnesses, John Roumas and Sherman Hopkins. The court at first limited the cross-examination of the witnesses in the manner charged but afterwards permitted them to answer the questions. Whatever error, if any, was thereby cured. The record also shows that the court permitted Jordan Johnson to answer the very questions on cross-examination that it is contended the court excluded over plaintiff in error's objections.

J. D. Mann was asked, on cross-examination, what his first name was and whether the name he gave was the name given him at birth, and also as to where his home was, all of which he declined to answer. The court at first ruled that he should answer, but later, on the witness' refusal to answer, sustained an objection to the question. Technically this was an error, but we cannot see wherein plaintiff in error was prejudiced thereby. No reason appears in the record for the witness' refusal to answer. He did answer that he was in jail and that he was committed there upon a charge of felony. In our judgment the witness was more discredited in his refusal to answer than if he had made full· answers as to his name and residence. The natural inference by his answer is that he had a history that he did not want to reveal, and that the reasons therefor were connected with other charges against him of a criminal nature.

There is no merit in the contention that the court erred in permitting the State to introduce evidence concerning experiments made in fitting the blue-steel revolver into the wounds on the body of George Roumas. The grounds for

276 – 21

the objection are that it called the jury's attention to the fact that a double murder had been committed, and because plaintiff in error was not present. The evidence in reference to the killing of George Roumas was inseparable from the evidence in relation to the killing of Louis Roumas and was therefore admissible as a part of the *res gestæ*. (*Hickam* v. *People,* 137 Ill. 75; *Lander* v. *People,* 104 id. 248; *Farris* v. *People,* 129 id. 521.) The evidence as to the character of the wounds on the body of George Roumas was admissible for the further reason that the character of the wounds was shown by the evidence to point to the owner of the blue-steel revolver as the person who committed the double murder, which was shown by the evidence to have been committed at the same time and by the same men. The fact that such experiments were made in the absence of plaintiff in error goes merely to the weight of the evidence and not to its admissibility. *Moore* v. *State,* 96 Tenn. 209.

Henry Bailey, an officer of Paducah, Kentucky, was placed on the witness stand to identify plaintiff in error as the person whose conviction of the infamous crime of burglary was shown by People's exhibit 5. At first he identified the prisoner positively but later qualified his identification. Plaintiff in error objected to the evidence on the ground that he was not properly identified by the witness as the Walter Smith named in the exhibit as the defendant convicted. After his cross-examination the State's attorney asked to have the exhibit withdrawn and the evidence of Bailey excluded, and the court instructed the jury to disregard the excluded evidence and to give it no consideration in the case. The court did not err in its first refusal to exclude the evidence because of the fact that the witness first positively identified the plaintiff in error as the Walter Smith named in the People's exhibit. When the witness weakened on his evidence the court did all that it could do to take the evidence from the consideration of the jury.

Besides, we do not think the defendant was unduly prejudiced thereby, although the evidence was afterwards shown to be inadmissible by the further examination of the witness.

The most serious objection presented in this record is that taken to the remarks of counsel for the State in his argument to the jury in which he said, "There is a parole law which turns them out as fast as it gets them there," meaning thereby that the Parole law turned criminals out of the penitentiary as fast as they get there. If the State's attorney was arguing on the question of punishment at the time such remark was made it might have a tendency to cause the jury to award the more severe penalty. The Parole law has no application whatever to criminal trials and the State's attorney was clearly beyond his rights in using such expression. (*Farrell* v. *People*, 133 Ill. 244.) The court, therefore, erred in not sustaining the objection to the remark. We do not think, however, that the remark prejudiced plaintiff in error in this case. This appears from the verdict itself, in which the penalty of death was inflicted by the jury as to plaintiff in error and a sentence of ninety-nine years was given to defendant Armstrong. The remark was equally applicable to both defendants and was not specially directed to the plaintiff in error, so far as the record shows. The crime committed by plaintiff in error was a very revolting one. The evidence against him was much stronger than the evidence against Armstrong because of the fact that the latter was not identified by so many persons. The evidence also shows that Murphy was the one who shot Louis Roumas, and it tends to show that he also killed George Roumas. The jury no doubt inflicted the different penalties upon the two defendants for those reasons and not on account of the remarks made by the State's attorney. We do not believe the remarks figured in fixing the penalty of plaintiff in error or we would not hesitate to reverse the judgment on account of this error.

The other errors assigned and argued are trivial in character and in no way affect the merits of the case and are therefore passed without any further consideration. Plaintiff in error could not reasonably expect another or different verdict at the hands of another jury. It should not be and is not the policy of this court to reverse a judgment merely because error has been committed, unless it appears that real justice has been denied thereby or that the verdict of the jury or the judgment of the court may have resulted from such error. There is no such showing in this record, and the judgment of the circuit court is affirmed.

The clerk of this court is directed to enter an order fixing the period between nine o'clock in the forenoon and four o'clock in the afternoon of February 16, 1917, as the time when the original sentence of death entered in the circuit court of Vermilion county shall be executed. A certified copy of such order shall be furnished by the clerk of this court to the sheriff of the county of Vermilion.

*Judgment affirmed.*