(No. 13488.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RICHARD WEIR, Plaintiff in Error.

*Opinion filed December 21, 1920.*

1. CRIMINAL LAW—*naming defendant with an alias does not charge two persons with the crime.* A count in an indictment for murder charging that Richard Weir made the assault and that Richard Weir, *alias* Dick Weir, fired the fatal shot does not amount to a charge that two different persons committed the crime; nor does such a charge follow because some counts name the defendant with the *alias* while others do not.

2. SAME—*evidence of condition of victim's family after homicide is not admissible.* In a trial for murder, evidence of the circumstances in which the victim's wife was left after the homicide and of the number of children in the family is not admissible where it does not in any way affect the question of the guilt or innocence of the defendant.

3. SAME—*when instruction is not erroneous as ignoring self-defense.* Although a defendant pleads self-defense, if there is nothing in the evidence tending even remotely to prove that the killing was done in self-defense it is not error to give an instruction defining malice aforethought, and stating, without mentioning such defense, that killing with malice aforethought is murder.

4. SAME—*instruction may assume existence of undisputed fact.* In a trial for murder, where it is proved and not denied that the defendant assaulted and killed the deceased, it is not error for an instruction to assume the existence of the undisputed fact.

5. SAME—*what necessary to justify reversal because of error in admission of evidence.* To justify a reversal on account of error in admitting incompetent evidence it must appear that the error deprived the defendant of some substantial legal right, and that upon another trial, with the evidence excluded, a different result may be expected.

THOMPSON, J., specially concurring.

WRIT OF ERROR to the Circuit Court of Saline county; the Hon. A. W. LEWIS, Judge, presiding.

JOHN J. PARISH, and FOWLER & RUMSEY, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, JAMES B. LEWIS, State's Attorney, and ALBERT D. RODENBERG, for the People.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

Richard Weir, plaintiff in error, was indicted in the circuit court of Saline county for the murder of David Nalley, and upon a trial was found guilty and sentenced to imprisonment in the penitentiary for the term of his natural life.

There was a motion to quash the indictment, which contained six counts charging the defendant with shooting and killing David Nalley, and the motion was sustained as to the sixth and overruled as to the other counts. The objection to the five counts on which the defendant was tried is, that in the first, third and fifth counts the defendant was named as Richard Weir, and in the second and fourth as Richard Weir, *alias* Dick Weir; and in the second it was charged that Richard Weir made the assault, and Richard Weir, *alias* Dick Weir, fired the fatal shot. The argument is that the indictment charged two different persons with having committed the crime. But that is not true. The charge in each count was against the same person, and the

*alias* simply meant that Richard Weir was otherwise called
Dick Weir. The court did not err in refusing to quash the
indictment, and the record shows Richard Weir, *alias* Dick
Weir, as being present during the trial.

The following facts were proved: The defendant, Rich-
ard Weir, owned a farm of forty acres in Saline county,
on which there was a five-room house. Two rooms faced
west, with an entrance to each room from a small porch
extending past the front door of each, and on the east
there were three rooms, with a small porch as an entrance.
On February 19, 1918, the defendant made a written lease
to David Nalley of the two west rooms at $7 a month, with
garden and potato patch, the rent payable monthly, ten acres
on the west side of the house to be planted in corn at $4
per acre for the crop grown for the year 1918, rent to be
paid in full after the crop was made and the crop to stand
good for the rent. If Nalley should see that he could not
put the land in corn or could not tend it, he was to turn
the land over to defendant in time for him to get it tended
or tend it himself. The defendant lived in the rooms on
the east side of the house and had a boy fourteen years old,
named Jimmie Carney, living with and employed by him.
Nalley was a coal miner and had no team to work the
corn land, and he made an agreement with John A. Logan
Bishop, who had a farm team and worked on public roads,
to prepare the ground and plant the ten acres in corn.
That agreement was made on February 26, 1918, and on
March 5 the defendant went to Bishop's house and asked
him if he had made a contract with Nalley to put in the
ten acres of corn. Bishop said, nothing but a verbal con-
tract, and defendant asked him if he could do the work,
and he said he could. The defendant said Nalley had vio-
lated his contract and told Bishop not to plow on the land;
that he was going to get Nalley off the farm, and said,
"Don't you plow none on the farm." The same day the
defendant prepared and caused to be served by N. A. Chois-

ser, a constable, a notice to Nalley that in consequence of
Nalley's fault in trespassing on and in parts that were not
included in his tenancy in the house the defendant elected
to terminate the lease, and notified Nalley to quit and de-
liver up the house and grounds within ten days. Golda
Nalley, wife of Nalley, was an expectant mother, and made
an arrangement with Emma Bishop, sister-in-law of John
A. Logan Bishop, to be present and assist her at her con-
finement, and at the same time that the defendant had the
talk with John A. Logan Bishop and told him not to plow
the land he asked Bishop to tell his sister-in-law and How-
ard Bishop, her husband, to stay away and keep down
trouble. The child was born on March 17, and no one
being with Mrs. Nalley, the defendant in the adjoining
room, hearing her, asked if she needed help, and she said
she did, and he went after her husband. The next day,
March 18, the constable, Choisser, came to the house and
served on Nalley an execution and summons in some other
proceeding not connected with the defendant. After serving
the execution and summons Choisser and Nalley went into
the north room, where Mrs. Nalley was in bed with the
baby. While they were there the defendant sent Jimmie
Carney to a garden southeast of the house to pull onions
for dinner, and one of Nalley's children came in and told
Nalley what the boy was doing, and he went out of the
house and told Carney not to get any more of the onions,—
that they belonged to him and he was paying rent for the
garden. The defendant came out on the porch at his side
of the house and said the onions belonged to him and told
the boy to get them and come in to dinner. The defend-
ant had a loaded single-barrel shot-gun and raised the gun
and aimed at Nalley, who was standing by a tree near the
corner of the house, facing southeast toward the garden,
where the Carney boy was. Choisser hearing the disturb-
ance came out of the house and saw no one but Nalley. He
went out about the middle of the porch and called, "Nal-

ley, you come here." Nalley had said nothing to the defendant and turned toward the house, with his right side toward the defendant, and as he turned he called the defendant a cowardly son-of-a-bitch if he did not shoot. The defendant shot and the charge took effect in the upper third of the right arm, passing through the arm into the body and killing Nalley instantly. The only clothing Nalley had on was a woolen shirt, trousers and underwear. He was unarmed and had nothing in his pocket but a small pocket knife, a fifty cent piece and a small paper, and his hands were hanging at his side in plain view. Mrs. Nalley hearing the shot got out of bed and went out on the porch and saw that her husband had been shot, but she was immediately called back.

None of these facts were disputed, but it was alleged that the killing was done in self-defense. The defendant testified that he had been sweeping in the room occupied by him before getting dinner and while sweeping set the loaded gun out on the porch to have it out of the way; that he heard Nalley claim the onions and went out and told Jimmie Carney to get them and come on to dinner; that Nalley dared him to shoot and made a play for his pocket; that he called him a son-of-a-bitch and a coward if he did not shoot, and that witness reached for the gun and fired the shot. The statement that he reached for the gun after Nalley dared him to shoot is, of course, impossible, for Nalley did not dare him to shoot while the gun was sitting back on the porch out of Nalley's sight, and he did not know it was there. The defendant further testified that he had seen Nalley have a pistol, and Nalley had said he aimed to get the defendant before it was over with. He denied that Nalley had told him he got a 22-caliber pistol for his wife because he had to work at night and she felt safer with a gun. A witness testified as to that matter that on March 5, the day the defendant served the notice and visited Bishop, the defendant said he met Nalley a while

before and asked him if he had a gun for him, and Nalley said that he had not got a gun for him but had got a 22-caliber pistol for his wife, as she was home alone at night and felt safer with a gun, and the defendant said he told Nalley that if there was any getting to be done he would be the one that would do the getting.

In the examination of Golda Nalley she was asked what her family consisted of, and she testified that there were four girls and one boy, and in the examination of the constable concerning what happened when he was in the north room and Mrs. Nalley in bed, he was allowed to testify that he had children of his own, giving the number, and said that Mrs. Nalley's baby was a small baby,—just an infant. This evidence was not relevant or material to the issue, as the number of Nalley's children or of the constable's, or the manner and circumstances in which Nalley's wife was left by the homicide, did not in any way affect the question of the guilt or innocence of the defendant or the punishment which would be proper. (*Filippo* v. *People*, 224 Ill. 212; *People* v. *McMahon*, 244 id. 45.) The tendency of such evidence was to create prejudice against the defendant and the court erred in overruling objections to it, but afterward the court excluded the evidence with reference to the number of children.

The court refused to strike out the evidence with reference to securing help for the confinement and that there was none, and in this did not err, for the reason that it showed the disposition and attitude of the defendant toward the family and his efforts to dispossess Nalley. There was no evidence tending to show that Nalley had violated his contract in any particular or made any default, but the defendant, for the malicious purpose of evicting him, tried to prevent Nalley from securing anyone to cultivate the land and to make conditions as bad as possible for the family.

The only defense alleged was self-defense, and the defendant testified, in accordance with the well-worn custom

295–18

when that defense is interposed, and contrary to the fact, that before he shot Nalley threw his hand to his pocket. There was not a semblance of truth in the statement, and the testimony of the defendant himself shows that he did not think Nalley was going to shoot him. Nalley's hands were hanging at his side and he was turning away from the defendant toward the front porch. It may be said, in any case, that the defense interposed is self-defense, but in this case unquestioned facts showed that there was no defense. So far as the alleged defense is concerned, however, the court gave several instructions, stating at length the law respecting self-defense.

The court gave the following instruction:

"The court instructs the jury, as a matter of law, that the words 'malice aforethought' do not necessarily imply the lapse of a considerable time between the malicious intent to take life and the actual execution of that intent. Whether the design to effect death was formed on the instant or had been previously entertained for any considerable time is immaterial, for the killing with malice aforethought, if proven by the evidence beyond a reasonable doubt, is murder under the laws of this State."

The objection to this instruction is that it ignored the defense of self-defense, and in a case where there is any substantial ground or evidence tending to prove that a killing was in self-defense it is error to give such an instruction. (*People* v. *Penman*, 271 Ill. 82; *People* v. *McDowell*, 284 id. 504.) There was nothing in this case tending even remotely to prove that the defendant killed Nalley in self-defense or that there was any provocation sufficient to make the killing manslaughter.

It is objected to the instructions numbered 15 and 16 that they assumed that the defendant assaulted and shot Nalley. That is true, but the fact was proved and not denied. The defendant himself testified that he shot him, and

therefore it was not error to assume the existence of the undisputed fact.

It was error to admit evidence of the number of children which Nalley or the constable had, but, whether the subsequent striking out of the evidence cured the error or not, the court would not be warranted in reversing the judgment. To justify a reversal on account of error in the admission of evidence it must appear that upon another trial, if the evidence is excluded, a different result might be expected, so that the error deprived the defendant of some substantial legal right. (*People* v. *Murphy,* 276 Ill. 304; *People* v. *Green,* id. 346; *People* v. *Moore,* id. 392.) The defendant was proved guilty of murder by legal and competent evidence and a different result could not be expected on another trial. The verdict and sentence were not for the extreme penalty of the law, which the evidence would have fully justified. There was no other error committed on the trial and there is no ground for belief that a result more favorable to the defendant could be expected on another trial, and therefore the judgment will be affirmed.

The judgment is affirmed.　　　*Judgment affirmed.*

Mr. JUSTICE THOMPSON, specially concurring:

I agree with the conclusion reached by the court and with all that is said in the opinion except the holding of the instruction defining "malice aforethought" bad on the ground that it ignores the defense of self-defense. If the killing is done with malice aforethought, as stated in this instruction, it is not done in self-defense. The law laid down in this instruction is sound, and it was not necessary to make any reference to the special defense set up to excuse the killing. The principle of self-defense was fully defined in other instructions given and the condemned instruction harmonizes with them. We have repeatedly said that it is not necessary for each instruction to contain all the law applicable to the case, and I think that rule ought to be applied here.