(No. 16911.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EMIL FRICKER, Plaintiff in Error.

*Opinion filed February 18, 1926—Rehearing denied April 8, 1926.*

1. CRIMINAL LAW—*whether prejudice exists sufficient to require change of venue is question of fact.* Whether a prejudice exists in the minds of the inhabitants of the county in which the crime was committed sufficient to raise a reasonable apprehension that the defendant will not receive a fair and impartial trial in that county is a question of fact.

2. SAME—*when defendant cannot complain that he was compelled to accept unsatisfactory jurors.* A defendant cannot complain that because of the exhaustion of peremptory challenges he was compelled to accept jurors unsatisfactory to him, where the trial court did not require the defendant to use a peremptory challenge upon a venireman in any way disqualified to serve as a juror.

3. SAME—*evidence of the defendant's illicit relations with deceased's wife is admissible in trial for murder.* In a prosecution for murder, evidence of the defendant's illicit relations with the deceased's wife is admissible to show a motive for the crime; and the fact that such evidence discloses another indictable offense does not render it incompetent if it tends directly to show the defendant guilty of the crime charged.

4. SAME—*what argument of State's attorney is proper.* The State's attorney does not transcend the bounds of legitimate argument where his remarks, which are objected to, are in answer to argument of the opposing counsel and are based upon evidence appearing in the record.

5. SAME—*what remark of juryman is not sufficient to warrant new trial.* In a prosecution for murder, an affidavit that a juryman, after he had been summoned for jury service, said, in response to the question what he would do if selected for the murder case, that if a man was proved guilty and the evidence warranted it he would hang him, is not sufficient to warrant a new trial, as the remark does not tend to impeach the juror's fairness or impartiality or to show that he was disqualified to serve on the jury.

WRIT OF ERROR to the Circuit Court of Madison county; the Hon. LOUIS BERNREUTER, Judge, presiding.

MAURICE B. JOHNSON, and HAROLD J. BANDY, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JESSE R. BROWN, State's Attorney, MERRILL F. WEHMHOFF, and M. L. WELCH, for the People.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Emil Fricker, Eldo Wernli and Jacob Landert were indicted in Madison county for the murder of John Nungesser. Wernli and Landert pleaded guilty and were sentenced to the Southern Illinois penitentiary for their natural lives. Fricker had a separate trial and by the jury's verdict was found guilty and his punishment fixed at death. His

motion for a new trial was denied. Judgment was rendered upon the verdict and sentence of death imposed. Upon Fricker's application to this court a writ of error was allowed and made a *supersedeas*. Hence the record is here for review.

John Nungesser was a farmer twenty-four years of age. He resided with his wife, Minnie Nungesser, on a farm near the city of Highland, in Madison county. On September 15, 1924, he had worked in the field all day and had been seen to start home at about six o'clock in the evening on a wagon drawn by four horses. About half an hour later his body was found alongside of a highway known as the Mudge road, which led toward his home. His body was in a kneeling posture, with his head over his left arm. It was covered with blood, and there were eight or ten bullet holes in his head, one in his abdomen and two in his shoulder. Fricker was also a farmer. He was forty-four years of age, married, and resided with his wife and three children on a farm of 196 acres in Clinton county, about four miles southeast of Highland. He also owned the Hailing farm, which is situated in Madison county, a short distance from his home. Besides his farming enterprises Fricker conducted a dairy business. In 1910 Minnie Schlicht, then fifteen years of age, entered Fricker's employ as a domestic servant and dairy maid. She continued to live in Fricker's home until her marriage to Robert Kehrli. From the time she was nineteen years old until her marriage, which was a period of several years, Fricker had sexual intercourse with her two or three times a week. Kehrli, her husband, was murdered shortly after their marriage and she returned to Fricker's home. She remained there two years, until she married Nungesser, in October, 1922. During this period Fricker's illicit relations with her were resumed.

Eldo Wernli, who was indicted with Fricker and pleaded guilty, was twenty-two years of age. In January, 1923,

320—32

he began to court Fricker's daughter Orlene, then eighteen years old. Fricker objected, and on the first day of August following, Wernli and Orlene Fricker eloped and were married. They made their home with her aunt, who resided in Highland, and Wernli did not converse with his father-in-law from the time of his marriage until July, 1924. Jacob Landert, the other co-defendant, who also pleaded guilty, was a bachelor, forty years of age. During a period of fifteen years he had been irregularly employed by Fricker to work on his farm. At the time Nungesser was murdered Landert was in Fricker's employ and lived in a house on the Hailing farm.

According to the evidence adduced in behalf of the State, Fricker wanted Mrs. Nungesser to return to his home, and to that end he began, early in 1923, to plot the murder of her husband. To accomplish his purpose he sought the participation of Arthur Buehne, Henry Reinhardt, Wernli and Landert in the commission of the crime. Neither Buehne nor Reinhardt, however, had any part in the plan which was finally executed. Fricker first disclosed his purpose to Wernli in January, 1923. Shortly thereafter, while Wernli paid attentions to Fricker's daughter, Fricker told him that he would have to kill Nungesser before he could marry his daughter. Until the elopement Fricker occasionally discussed the proposed murder of Nungesser with Wernli. Beginning in July, 1924, these discussions became more frequent, and Landert, who had returned to Fricker's employ, participated in them. Sometimes these conferences were held in the basement of Fricker's home and at other times on the farm in Madison county. One plan proposed by Fricker was that Wernli and his wife, who were Nungesser's friends, were to go to his home and pretend that they were paying him a visit. Landert could not drive an automobile, and Fricker suggested that Reinhardt, once employed by him, should drive Landert to Nungesser's home in the dark, and after Wernli on some pretext had induced Nungesser to

leave his house, Landert was to shoot him. If for any rea-
son an opportunity was not afforded Landert to shoot Nun-
gesser, then Wernli was to invite him to go fishing in a cer-
tain pond with Wernli and Landert, some wine and whiskey
prepared by Fricker were to be given Nungesser in order
that he might become intoxicated, and after his intoxication
he was to be thrown into the pond. Reinhardt did not meet
Landert at the time appointed to carry out the first plan
and it failed. The second plan also failed because Nun-
gesser did not appear.

Other plans for the murder of Nungesser had been pro-
posed by Fricker to Wernli and Landert but all failed of
consummation. Fricker charged that Wernli and Landert
were deserting him, and because of their repeated failures
he at one time flourished a revolver and threatened Wernli's
life. Under a threat that he would make trouble for them
if they failed to comply, Fricker directed Wernli and Lan-
dert to meet him on Sunday, September 14, 1924, to make
arrangements for the murder of Nungesser on the evening
of the following day. They met Fricker in his field, where
he was at work on Sunday afternoon, and the plan for Nun-
gesser's murder was perfected. The route which Wernli and
Landert were to follow was carefully laid out. Landert was
to lie down in the automobile in which they rode, so that
if it was seen it would appear that only one person occupied
it. They were to hide the automobile near the highway
over which Nungesser, after his day's work, would drive
to his home. Fricker gave them three revolvers, oiled and
filled with new bullets so that they would not fail, two of
them, a 25-calibre automatic and a 32-calibre break-open,
to Wernli, and the third, a 32-calibre automatic, to Landert,
with instructions to use them all, so that it would appear
that three, and not two, persons had done the shooting.
When Nungesser approached, Wernli was to stop his horses,
engage him in conversation, and Landert, from his hiding

place in the weeds, was to begin the shooting, after which Wernli was also to participate in it.

About five o'clock on Monday afternoon Wernli and Landert left the Hailing farm in an automobile and drove over the route designated, to a point near the field where Nungesser was at work. They hid the car and Landert secreted himself in the weeds. In a short time Nungesser approached on the highway in a wagon drawn by four horses abreast. Wernli stopped the horses, and while he conversed with Nungesser Landert shot him in the abdomen, and Nungesser fell off the wagon. During the next few moments Landert's revolver failed to discharge and Wernli then shot Nungesser seven or eight times. Landert soon succeeded in getting his revolver into working order again, and Wernli said to him, "He is not dead yet; you had better give him a few more." Landert complied with the request and fired several shots into Nungesser's body. After the shooting Wernli and Landert first returned to the Hailing farm, where they fed some hogs, and then went to Fricker's home. Landert remained in one room while Fricker took Wernli into another. Fricker asked Wernli "whether everything was all right." Wernli answered that "it was over with." Fricker then said, "You don't have to fear me any more; that is all I asked you to do; you are all right now." A little later, under a tree in the yard, Fricker, addressing Wernli and Landert, said, "Well, did you do the job?" To their affirmative answer he rejoined, "That is all right; that is what I wanted." Wernli and Landert then returned to the latter's place of abode on the Hailing farm, and from there Wernli proceeded to his home in Highland. Within a few hours Wernli was arrested, and Landert and Fricker were taken into custody during the same night. The foregoing is substantially the testimony of Wernli and Landert, both of whom attributed their part in the commission of the crime to their fear of Fricker.

Minnie Nungesser testified that shortly before her marriage to Nungesser, Fricker told her not to marry him because he would kill any man she might marry; that about two weeks after her marriage, at Fricker's request, she went to his home to collect money he owed her; that he paid her a part and by a threat, enforced by a revolver, compelled her again to submit to sexual intercourse with him; that she returned to her husband after remaining at Fricker's house one day; that about four weeks later Fricker again sent for her on the pretext that he would pay what he owed her and would not annoy her again; that she went to his house and remained there from Thursday until the following Monday, because he refused to permit her to return home, and that upon this visit she had improper relations with him three times.

On behalf of the defense several witnesses testified to Fricker's good reputation. Fricker denied that he ever suggested any plan for, or talked with any person about, the taking of Nungesser's life or that he in any way participated in the crime. He denied that he threatened to kill either Wernli or Landert or that he ever caused them to fear him. He admitted his illicit relations with Minnie Nungesser while she lived in his home but denied that such relations continued while she was married. He denied that he ever threatened Mrs. Nungesser's life or exhibited a gun in her presence, or that he attempted at any time to restrain her from returning to her husband.

It was stipulated that at the October, 1924, term of the circuit court of Madison county Fricker was convicted of the murder of Robert Kehrli and that he was sentenced to the Southern Illinois penitentiary for his natural life.

The errors assigned by plaintiff in error upon which he seeks a reversal of the trial court's judgment are: (1) The denial of his application for a change of venue; (2) the admission of the testimony of Minnie Nungesser; (3) the overruling of his objections to improper remarks by the

State's attorney in his closing argument to the jury; and (4) that he was not tried by a jury of twelve fair and impartial men.

In behalf of the plaintiff in error six residents of Madison county residing in or near Highland made affidavits, in which they stated that they heard the case discussed by many persons, and that the newspapers of that county and the daily newspapers of St. Louis, Missouri, repeatedly published accounts of the crime, detailing the facts in a light unfavorable to plaintiff in error and creating the impression that he was guilty. Certain of these affidavits added that after Wernli and Landert pleaded guilty the newspaper articles re-appeared and the discussions among the inhabitants of the county concerning the guilt or innocence of plaintiff in error were revived, and all the affiants expressed the belief that plaintiff in error could not receive a fair trial in Madison county. The newspaper articles to which reference was made in the affidavits were not submitted to the court. On the part of the State thirty-seven residents of different parts of Madison county made affidavits, in which they stated that no greater interest was taken in the case than was usually shown where the charge was murder; that no threats of violence had been made, and that they did not believe that any general feeling existed against plaintiff in error or that the inhabitants of the county were prejudiced against him.

Whether a prejudice existed in the minds of the inhabitants of Madison county sufficient to raise a reasonable apprehension that plaintiff in error would not receive a fair and impartial trial in that county is a question of fact. (*People* v. *Murphy,* 276 Ill. 304; *Jamison* v. *People,* 145 id. 357.) All of the affidavits submitted by plaintiff in error were made by persons who resided near the scene of the murder, in the eastern part of the county. Even if the people of that particular locality were prejudiced against plaintiff in error it would not follow that the inhabitants of the rest of the county had any feeling against him. Madison

county, it appears, has approximately 125,000 people, a great majority of whom dwell in the west half of the county. From the affidavits filed by the prosecution, which were made by residents of various parts of the county, it appeared that no feeling or prejudice existed against plaintiff in error. In this respect the instant case differs from *People* v. *Pfanschmidt,* 262 Ill. 411, and *People* v. *Arthur,* 314 id. 296. Intense feeling and extreme prejudice were shown to exist against the defendant in each of those cases. Under the showing here made no reasonable apprehension could arise that plaintiff in error would not receive a fair and impartial trial in Madison county.

Plaintiff in error further insists that a change of venue should have been granted because one hundred and thirty-three veniremen were examined before a jury was selected; that of these veniremen seventy-seven stated that they had opinions as to how the case should be decided; that he was required to exhaust his peremptory challenges before the jury was completed; that of the jury as thus composed two jurors were unsatisfactory to him, and that under the circumstances a fair jury was not obtained. It appears from the affidavit of Simon Kellarmann, Jr., the deputy clerk of the circuit court of Madison county, who at the request of the attorneys for plaintiff in error and by order of the trial court kept a record of the veniremen examined, that plaintiff in error, in the selection of the last panel of four jurors, exercised seven peremptory challenges, and that he was not required to use such a challenge to exclude any venireman who stated that he had an opinion concerning the guilt or innocence of plaintiff in error. Manifestly, plaintiff in error could not have been compelled to accept as a juror a venireman who had a fixed and positive opinion as to his guilt or innocence or who was so prejudiced against plaintiff in error that he could not give him a fair and impartial trial. (*Coughlin* v. *People,* 144 Ill. 140; *Carrow* v. *People,* 113 id. 550.) But the trial court did not require plaintiff

in error to exhaust a peremptory challenge upon a venire-man in any way disqualified to serve as a juror. If plaintiff in error chose to do so when it was unnecessary he cannot now complain. The application for a change of venue was properly denied.

Plaintiff in error argues that Minnie Nungesser should not have been permitted to testify to illicit relations with him after her marriage or that on one occasion he compelled her to submit thereto, because, he asserts, these acts constituted substantive offenses not related to the crime charged. Wernli and Landert testified that they actually shot Nungesser but that plaintiff in error planned and directed the commission of the crime. The prosecution sought to show that the desire of plaintiff in error to continue his illicit intercourse with Mrs. Nungesser led to the perpetration of the murder. He admitted his sexual relations with her prior to her marriage but denied that they continued thereafter. Proof of improper intimacy between them after her marriage would tend to show that he had a motive for seeking the death of her husband. In *State* v. *Reed,* 53 Kan. 767, the court said: "It has been universally conceded, since David wrote to Joab, 'Set ye Uriah in the forefront of the hottest battle, and retire ye from him, that he may be smitten and die,' that the man who covets his neighbor's wife has a motive for desiring the death of his neighbor." Illicit connections may be proved to show a motive where the defendant is charged with the murder of a husband whose existence was an obstacle to the complete gratification of the defendant's wrongful desires with the wife. (1 Wigmore on Evidence,—2d ed.—sec. 390; Underhill on Crim. Evidence,—3d ed.—sec. 503; *State* v. *Reed, supra; Commonwealth* v. *Ferrigan,* 44 Pa. 386.) Nor does the fact that the testimony of Mrs. Nungesser disclosed plaintiff in error guilty of other indictable offenses afford a reason for excluding that testimony. Whatever testimony tends directly to show the defendant guilty of the crime charged

is competent although it tends to show him guilty of another and distinct offense. (1 Wigmore on Evidence,— 2d ed.—sec. 216; *People* v. *Moeller*, 260 Ill. 375; *People* v. *Jennings*, 252 id. 534; *People* v. *Hagenow*, 236 id. 514.) The testimony of Mrs. Nungesser was properly admitted.

It appears that one of the attorneys for plaintiff in error, in his closing argument to the jury, said in substance: "It was those self-confessed criminals, Eldo Wernli and Jake Landert, who sat on that witness stand [pointing toward it] and told you how they killed John Nungesser, and a court in its mercy has let them off with life imprisonment. Emil Fricker was not there. He did not hold those guns in his hands, and with them receiving life imprisonment, and in the light of all this testimony, don't you think you ought to at least show this defendant some consideration? Human limitations do not justify the efforts of the prosecution to hang this man." The State's attorney replied: "If you are not satisfied with the plea of guilty of Wernli and Landert and the punishment meted out to them you should come in and offer to plead the defendant guilty," to which counsel for plaintiff in error objected. The State's attorney then said: "I made this statement: That they have argued this defendant ought not to receive any more punishment than Wernli and Landert, and if they wanted him to receive punishment and take the mercy of the court they might let him plead guilty and do the same thing." The trial court added, "The statement was, Why don't they let the defendant plead guilty and throw himself upon the mercy of the court?" Finally the State's attorney repeated, "I said: If they think they got off light and he should not receive any more than they, then they should let him plead guilty." The remarks of the State's attorney were made in answer to the argument by counsel for plaintiff in error and were based upon evidence appearing in the record. The prosecuting attorney had the right, in such a situation, to answer opposing counsel's argument. His remarks did

not transcend the bounds of legitimate argument. *People v. Lloyd,* 304 Ill. 23; *People* v. *Wood,* 318 id. 388.

On the argument of the motion for a new trial plaintiff in error filed the affidavit of Gilbert A. Tschannen, to the effect that he had a conversation with John A. Isert, who later served as a juror in the case; that in the conversation Isert informed Tschannen that he had been summoned for jury service; that Tschannen then asked Isert, "What would you do if you got on the Fricker case?" and that Isert answered, "I would hang him." A counter-affidavit by Isert was submitted in which he set forth that Tschannen's affidavit did not state all of the conversation; that Tschannen asked him what he would do if he was accepted as a juror, and that he answered, "Well, if a man was proved guilty and I thought the evidence warranted it, I would hang him." A second affidavit by Tschannen was filed, in which he stated that his former affidavit did not contain all that Isert said and that Isert's affidavit stated the conversation correctly. What Isert actually said is not, therefore, in dispute. His answer to Tschannen does not even tend to impeach his fairness or impartiality or show that he was disqualified to serve on the jury.

The judgment of the circuit court of Madison county is affirmed. The clerk of this court is directed to enter an order fixing the period between nine o'clock in the forenoon and four o'clock in the afternoon of the 16th day of April, 1926, as the time when the original sentence of death entered in the circuit court of Madison county shall be executed. A certified copy of that order will be furnished by the clerk to the sheriff of Madison county.

*Judgment affirmed.*