(No. 35550.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SIDORO AGNELLO, Plaintiff in Error.

*Opinion filed May 19, 1961.—Rehearing denied September 20, 1961.*

EDMUND M. TOBIN, of Chicago, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and JOHN T. GALLAGHER, and JAMES J. GLASSER, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

Sidoro Agnello, whom we will refer to as defendant, was indicted by the grand jury of Cook County for the robbery of a tavern located on Kilbourn Avenue in the city of Chicago on September 14, 1955. Jointly indicted with the defendant were John Demitralis and Kenneth Thurman whose cases were disposed of on pleas of guilty.

About one year later the defendant was tried by a jury, found guilty, and was sentenced to the Illinois Penitentiary for life, the habitual criminal count explaining the severe punishment.

Before passing upon the many assignments of error presented by defendant on this writ of error, we deem it important to recite rather fully the factual basis for this conviction.

At 10:00 o'clock of the evening of September 14, 1955, the O'Dell Tavern was robbed, and $135 was taken from the business and the customers. John Demitralis testified for the prosecution as follows: He had been acquainted with Sidoro Agnello, under the name of John Sheets, since 1941 and had known Kenneth Thurman since 1945. On September 14, in the afternoon, he saw Agnello in John's hotel room in the Linwood Hotel on Washington Blvd. Others present were Thurman, Sally Logan and Charlene Fuller. Demitralis was dressed in blue slacks and a yellow sport shirt, and defendant wore blue slacks and a gray shirt. At 8:30 P.M. he left the hotel room with Agnello,

Thurman, and Charlene Fuller, being driven by Agnello in his car. Agnello started to drive him home but Thurman suggested a robbery, stating that he was in dire need of money. He further testified: "I had a .45 caliber gun. There was one other gun in my presence. I saw it in the car when it was handed to Thurman. We drove to O'Dell's Tavern. All three of us adjusted handkerchiefs on our faces. As I entered the place I announced that it was a stick-up, ordered 8 or 9 people into the washroom and guarded them while Thurman and defendant collected the money," During the holdup policemen arrived, whereupon the three robbers fled in different directions after diving through a window in the rear of the premises. John entered a cab on Lake and Wilcox and commanded the driver to assist him in his flight. He was taken to a point about one block away from his hotel; he went to his room and in about one-half hour saw cars arriving loaded with policemen. "I tried to escape through the back door but was stopped, so I locked the door and got rid of my gun in the coal pile in the basement and on returning to the lobby was arrested." Sally Logan was in his room at that time. John further testified that he was placed in a line-up at the detective bureau where he was identified by John Brennan, one of the customers in the tavern at the time of the holdup. Soon thereafter Demitralis signed a written confession implicating Agnello and Thurman. Demitralis denied that he was given any hope of reward for the assistance he was giving the State in this prosecution. The final item in the record indicated that Demitralis was sentenced to the Illinois Penitentiary for an indeterminate period of four to eight years, the habitual criminal count being waived. The sentence was pronounced by the same judge who presided at this trial and was entered one day following the guilty verdict entered herein.

Tom Brown was the bartender at the time of the rob-

bery. His testimony as to the details of the incident were in most respects the same as the preceding witness. He was able to identify Demitralis because his mask fell down and he was able to get a full view of his face, and said, "I told the police officer that I was almost positive Agnello was one of the men." The description he gave the officer of the size and age of the men and color of their clothing corresponded with Demitralis's testimony.

John F. Brennan, a customer in the tavern at the time of the holdup, testified that he was one of several that was herded into the washroom, that the bartender, Brown, was called out to locate more money; that they took his wallet that contained no money, just identification cards; that upon the arrival of the police "all three went through the window." "Looking about the courtroom I recognize one of the three men who robbed the O'Dell Tavern" pointing toward the defendant; "I believe he was dressed in light blue or grey pants and shirt. He was holding one of the guns." Brennan recognized and pointed out each of the three men when they appeared at the show-up at the detective bureau on different dates. Brennan was present when Demitralis made his confession. Brennan further stated that at the show-up when he identified Agnello, "Agnello asked the policeman if he could ask me a question and Agnello asked, 'How did you identify me if I had a mask on, or if I wore a mask on?'" Brennan was sure that he received no aid from the police department by way of photographs or suggestions in his identification on the three separate occasions.

Barbara Marquard, who is employed in general office work, lives at 4452 W. Wilcox, which is only 40 feet east of Kilbourn Avenue, and was walking with her dog on the night in question. While she was at the northwest corner of Kilbourn and Wilcox she saw three men on the southeast corner of that intersection. There was a street light

on each of the corners, which were about 35 feet apart. When the three men moved southward, they were seen to place handkerchief masks on their faces. Miss Marquard then went across the street and on south to a point directly across from O'Dell Tavern and saw the three men enter the building and proceed with the robbery as has been described. A gentleman came along, and she advised him of what was taking place and asked him to notify the police, whereupon several squad cars came instantly. That night she went to the Warren Avenue police station where she recognized Demitralis in the line-up with several others. On September 18 she went to the same place and picked Kenneth Thurman out of the line-up, and she went back on September 19 and picked the defendant out of the line-up. She said the area was well lighted and that she was able to observe closely.

John Joseph McNally, an officer attached to the robbery detail on the night in question, testified that he received a call that stated that a white man with a revolver got out of the caller's cab at Wood and Lake Street and that he was followed to the Linwood Hotel at 1812 Washington Blvd. Police were sent to that location, and three officers guarded the rear and a like number remained at the front entrance. McNally said he went to room 204 in the hotel and found a young woman by the name of Sally Logan. She told him that her husband had just left. Shortly thereafter both Demitralis and Mrs. Logan were placed under arrest. McNally further testified that after Demitralis was identified at the show-up the next day by several people, he admitted his part in the robbery and named Kenneth Thurman and a man by the name of Sheets as participants. At the trial, Demitralis stated: "Sheets is the gentleman setting over here at the table" (indicating Sidoro Agnello). On Sunday of that week Thurman was arrested at 2638 S. Wentworth Avenue where he was staying with his daughter. McNally said Thurman admitted his part in the robbery, and he too

named Sheets as an accomplice. McNally further testified: "On September 19, we were posted in the 2700 block on North Avenue. We noticed two men talking and they went in an alley at North Avenue east of California. I recognized one of the men as Johnny Sheets. I told Agnello to march over to the car and put his hands on the side of the car. I searched him and found a revolver in his right hand pocket. On the way to the detective bureau the defendant said, 'I expected that, that God damn Greek Johnny Demitralis ratted on me', and he said 'when you get down town will you forget about the pistol?' " McNally further corroborated the other witnesses in their testimony concerning the show-ups when defendant was present and corroborated Brennan in his testimony that defendant asked him how he could possibly be identified when he had a mask over his face.

Samuel Rosen, chief clerk in the criminal court clerk's office, testified that Joe Mangan, according to the records of his office, identifying the pages, had been indicted for robbery in June, 1948, pleaded guilty and was sentenced to the penitentiary. Officer John J. Murphy testified that Joe Mangan and the defendant were the same person. On this review defendant does not question the propriety of this proof.

Kenneth Thurman returned from the penitentiary for this trial and testified for the defendant. His memory as to the events pertaining to the tavern robbery on September 14 was the same as the other witnesses except he could not remember the name of the third member of the trio, other than himself and Demitralis. He said, "It was not Sidoro Agnello. Agnello was with me in the show-up on September 19 at the detective bureau at Eleventh and State Streets." Thurman further testified that he had served time in the Illinois Penitentiary for robbery in 1932, 1934, 1947 and 1951; that he signed a confession while at the detective bureau; and that Barbara Marquard, who had identified him in the show-up, signed the statement as a witness.

On seven distinct occasions Thurman stated in his confession that Agnello participated in the robbery with him and Demitralis, but at the trial he said that was a mistake. He was reminded that at the conclusion of the statement it recited that he had read the confession and that it was given voluntarily without promise of reward. To this he explained that he had failing eye sight, that his glasses were in disrepair and that borrowed glasses did not help. Surely Thurman's valiant effort to be helpful to a brother in distress was not impressive.

Mrs. Marie Faciano was too ill to appear and testify, so her affidavit was received as evidence to avoid a continuance. In it she stated that the defendant came into her restaurant in River Grove, Illinois, about 8:30 in the evening of September 14; that shortly thereafter she and the defendant went to the King Cole Restaurant in River Forest, Illinois, ordered chicken and remained there until after 10:00 P.M.; that they then returned to her restaurant where defendant remained until 11:00 P.M., whereupon he departed in his car saying he was going home. To meet this alibi evidence, the State called Sally Logan. She testified that Agnello, Thurman and Demitralis were in room 204 in the Linwood Hotel on the evening of September 14 from 6:00 P.M. until 9:00 or 9:30 drinking and talking, when the three left in Agnello's car, having with them two revolvers; that Demitralis returned about 10:30 and soon thereafter the officers arrested her and Demitralis.

Officer Walter McTigue, who interviewed witnesses after the holdup, and a court reporter, who reduced to writing questions that were asked Barbara Marquard, testified for the defendant. Their testimony had little bearing on the factual picture hereinbefore presented.

We cannot agree with the defendant's contention that the proof offered on behalf of the prosecution was insufficient to convict. Admittedly there were discrepancies and

contradictions, but none of significance. We are not unmindful of the fact that Demitralis was well rewarded for the assistance he gave the State. A conviction may be predicated upon an accomplice's testimony even though it is not corroborated, if the jury finds it convincing. (*People* v. *Neukom,* 16 Ill.2d 340; *People* v. *McGuire,* 18 Ill.2d 257.) The evidence here conclusively established defendant's guilt.

We shall now turn to trial errors committed by the court. At the request of the People this instruction was given:

"The court instructs the jury that while the testimony of an accomplice is competent evidence such testimony is liable to grave suspicion and should be acted upon with grave caution. If the testimony of an accomplice carries conviction and the jury are convinced of its truth, beyond a reasonable doubt, they should give it the same weight as would be given to the testimony of a witness who is in no respect implicated in the offense, and the credibility of such an accomplice is for the jury to pass upon as they pass upon the credibility of any other witness."

The defendant made no objection to the giving of this instruction. In a most recent case *People* v. *O'Connell,* 20 Ill.2d 442, this court had occasion to reverse a conviction, solely because of the giving of such instruction. However, we said at page 446: "The instruction given with respect to the testimony of an accomplice was erroneous, and the error was not cured by any other instruction that was given. In view of the sharp conflict in the evidence and the crucial importance of the testimony of the accomplice, it cannot be said that this error in instructing the jury was not prejudicial to the defendant." We find here that there is no sharp conflict in the evidence and too we find that the court gave a defense instruction on the subject which would clarify any of the misleading aspects of People's instruction. It reads as follows:

"The jury are instructed that the witness, John Demitralis, is what is known in law as an accomplice, and that while it is a rule of law that a person accused of crime may be convicted upon uncorroborated testimony of an accomplice, still the jury should always act upon such testimony with great care and caution in the light of all other evidence in the case; and the jury ought not to convict upon such testimony alone, unless, after a careful examination of such testimony, they are satisfied, beyond a reasonable doubt, of the truth of such testimony, and that they can safely rely on it."

Another assignment of error concerns the giving by the People of an alibi instruction which reads as follows:

"The court instructs the jury, as a matter of law, that before a defendant can avail himself of the defense of an alibi the proof must cover the whole of the time of the commission of the crime and be supported by such facts and circumstances in evidence as are sufficient (when considered in connection with all the other evidence in the case) to create in the minds of the jury a reasonable doubt of the truth of the charge against the defendant."

The People in their brief frankly admit that the challenged instruction should not have been given and contend that the evil was partially obviated by the giving of a defense instruction on the subject which reads as follows:

"The court instructs the jury that, where a person on trial for a crime shows that he was at another place at the time the act was committed, he is said to prove an alibi. One of the defenses interposed by the defendant in this case is what is known as an alibi; that is, that the defendant was at another place at the time of the commission of the crime, and, therefore, could not have committed the crime.

"The court further instructs the jury that such a defense is proper and legitimate, and all evidence on this point should be carefully considered by the jury.

"If, then, in view of all the evidence, the jury should have a reasonable doubt as to whether the defendant was present or was in some other place when the crime was committed, the jury should give such defendant the benefit of the doubt and find him not guilty."

In the circumstances of this case, we are sure that the giving of the alibi instruction played no part in the jury's deliberation that resulted in a verdict of guilty. *People* v. *Pearson,* 19 Ill.2d 609.

Next it is urged that the court erred in giving a flight instruction. The proof is uncontradicted that the three bandits who invaded the O'Dell Tavern on September 14 fled by diving through the window in the rear of the building and rapidly leaving the scene, successfully eluding the many officers surrounding the premises. If the jury believed that Agnello was one of the bandits, carrying a revolver and robbing the O'Dell Tavern, they would hardly need the circumstance of flight to be convinced that he was a robber. The instruction was neither necessary nor prejudicial.

A more serious problem appears in the next assignment of error, namely, that the trial court refused to command the police department to produce reports from the investigating officer to the commanding officer. The court ruled that there was no showing that the police reports would contradict the testimony of such policemen at the trial, relying upon *People* v. *Moses,* 11 Ill.2d 84. On May 18, 1960, this court ruled differently in *People* v. *Wolff,* 19 Ill.2d 318. The People concede that under the rule announced in *Wolff,* the trial court erred in not ruling the State to produce the documents requested by the defendant. Although the policeman was one of the identifying witnesses to the robbery in the *Wolff case,* this court held that the denial was not prejudicial error, stating at page 328: "In determining whether an accused has been prejudiced by the rejection or exclusion of evidence, so as to require a reversal of the judgment, this court will look to the entire record to see if the rejected

evidence could have reasonably affected the verdict, * * * and will refuse to disturb the judgment where guilt is shown beyond a reasonable doubt or where, upon the evidence, the jury could not have reached a different verdict."

Here the policeman did not testify to any of the essential elements of the crime. Five days after the O'Dell robbery, officer McNally arrested the defendant. Surely the records would contain no contradiction of the circumstances surrounding his arrest. John Brennan, Barbara Marquard and John Demitralis identified the defendant as one of the robbers on the night of September 14. The defendant's alibi witness said he was not there. Thurman also made such a claim. This was the critical issue. The policeman's testimony did not touch this conflict in contentions so any records he might have made concerning his activity would be of little value to defendant.

It is unfortunate that trials cannot be conducted without error. Perfection in trial procedure is virtually unattainable. We have often said such is not the purpose of a trial, that the sole objective is the accomplishment of substantial justice.

In *People* v. *Murphy*, 276 Ill. 304, this court said that a judgment of conviction will not be reversed merely because error has been committed unless it appears that real justice has been denied thereby and that the verdict of the jury may have resulted from such error.

We have given consideration to all errors assigned and have discussed the significant ones. The judgment is affirmed.

*Judgment affirmed.*