ROSE COSTELLO, Plaintiff-Appellee, *v.* THE CHICAGO TRANSIT AUTHORITY *et al.*, Defendants-Appellants.

First District (4th Division)   No. 61345

Opinion filed July 14, 1976.

Sal M. Bianchi, John J. O'Toole, and Leonard L. Levin, all of Chicago, for appellants.

Sandman, Levy & Moltz, of Chicago (Morris A. Levy, of counsel), for appellee.

Mr. JUSTICE BURMAN delivered the opinion of the court:

The plaintiff, Rose Costello, commenced this action to recover damages for injuries allegedly caused by the defendants, Chicago Transit Authority (hereinafter referred to as C.T.A.), and its driver, George Mokate. Subsequent to a jury trial, a general verdict for the plaintiff was returned in the amount of $75,000. The jury also responded in the negative to a special interrogatory pertaining to whether the plaintiff was contributorily negligent at the time of the incident at bar. Thereafter, the trial court entered a judgment on the general verdict, thus giving rise to the instant appeal.

In seeking a reversal of the trial court's judgment, or, in the alternative,

a new trial, the defendants proffer four bases of review. They contend that (1) the verdict and judgment are against the manifest weight of the evidence; (2) the verdict and judgment are the result of prejudice to themselves and sympathy for the plaintiff; (3) the jury's response to the special interrogatory is contrary to law and fact; and (4) the award of damages is excessive.

A review of the record reveals that at the trial of the instant cause, both adversaries presented divergent accounts of the facts surrounding this controversy. In presenting her case-in-chief, on May 14, 1974, the plaintiff, age 71 at the time of incident, was first to take the stand. She testified on direct examination that on November 3, 1969, approximately at 6:30 a.m., she departed from her home and proceeded to walk to work on the west side of Pulaski Road. As she approached the southwest corner of the intersection of Pulaski Road and Augusta Boulevard,[1] she stopped and waited for the traffic signal, which was situated on the northwest corner of such intersection so as to control east-west traffic, to turn from red to green. While waiting for the light to change, the plaintiff initially observed the C.T.A.'s bus travelling southward, approximately a quarter of a block north of the Pulaski-Augusta intersection. Subsequent to noticing the locale of the bus as well as that the traffic light had turned green, the plaintiff thereupon took three steps within the designated pedestrian crosswalk to proceed eastward and was struck down by the front of the bus driven by the defendant Mokate.

Plaintiff was then taken to Saint Anne's hospital where she remained for six weeks. During the first two weeks of her hospitalization, she related that there was swelling in the front of her eyes. Moreover, when the swelling subsided, the plaintiff indicated that she could only see shadows. Further, even after her discharge from the hospital and an operation on her left eye in 1972, the plaintiff respectively expounded that she could still only see shadows and then, nothing at all. As a result of her blindness, the plaintiff indicated that she was no longer capable of resuming employment with a rubber company where she trimmed rubber tubes with an electrical blade.

On cross-examination, plaintiff reiterated much of what she had already testified. Besides recounting her conduct from the time she left her house until she was struck by the bus on the day in question, the plaintiff related that when the front part of the bus hit her, it knocked her forward on the street, but did not run over her. After plaintiff was unable to ascertain the distance which the bus thrust her forward or who rendered assistance to her, the trial court ordered a short recess since the plaintiff became upset.

---

[1] Parenthetically, Pulaski Road runs in north and south direction while Augusta Boulevard proceeds east and west.

A colloquy between the trial court and counsels for both sides then ensued in chambers in which defense counsel's motion for a mistrial on the grounds that the plaintiff broke down and began to cry was denied.

On May 15, 1974, the cross-examination of plaintiff resumed and was directed to her health following the November 3, 1969, accident. In addition to testifying that when she originally arrived at the hospital, she experienced pain in her head, back, shoulder and left leg, plaintiff also related that she could not see and subsequent to being discharged from the hospital, her neighbor not only brought her meals but cleaned her apartment.

After counsel for the plaintiff called two doctors and a neighbor concerning the plaintiff's eyesight, Chicago police officer Martin O'Malley took the stand. He testified that when he arrived at the scene of the incident, plaintiff was being placed in an ambulance and the C.T.A.'s bus was parked in a manner such that the rear of the vehicle was approximately eight feet south of the southernmost part of the crosswalk. Although not contained in his official accident report, Officer O'Malley related that when he asked the defendant Mokate what had previously transpired, the latter responded that he was driving southbound on Pulaski Road and that he proceeded through the intersection while the light was in the process of changing. Upon completion of the above testimony, counsel for the plaintiff called another doctor regarding the plaintiff's vision, the defendant Mokate pursuant to section 60 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 60), and then rested her case.

Subsequent to calling a practicing optometrist and a circuit court judge who, as former attorney for the C.T.A., took the plaintiff's deposition on March 30, 1971, the defendants called two individuals who testified as to their respective observations of the intersection following the incident. Jim Petrecca, a foreman for a printing industry, stated that as he approached the intersection, he saw the plaintiff on her knees about two feet east of the west curb of Pulaski Road. He expounded that since the plaintiff was bleeding profusely from her face and knees, he stopped his automobile and rendered assistance to her. He further related that during the time he administered aid to the plaintiff, the C.T.A's bus was parked on the west side of the street, with the rear of said vehicle located approximately 50 or 60 feet south of the crosswalk.

At the conclusion of Jim Petrecca's testimony, the defendants called Stanley Leck, a former supervisor in the transportation department of the C.T.A. He testified that on the morning of November 3, 1969, he received a call informing him to proceed to the intersection of Augusta Boulevard and Pulaski Road. When he arrived, he observed the plaintiff sitting on the sidewalk about eight feet south of Augusta Boulevard. He also indicated

that the rear of the C.T.A.'s bus was approximately 50 feet south of where the plaintiff was situated.

The defendant Mokate was next to take the stand and he presented his account of what transpired on the day in question. He testified that on November 3, 1969, approximately at 6:29 a.m., he was driving a C.T.A. trolley bus which contained 25 to 30 passengers and was travelling southward on Pulaski Road. As he proceeded to a bus stop located on the northwest corner of the Augusta-Pulaski intersection, he indicated that he was in the right hand lane and that there were not any cars in front of him. Subsequent to stopping the bus at such location in order to allow passengers to board the vehicle, the defendant Mokate looked at the traffic light, observed it was green, and started through the intersection at a speed of five miles per hour. When the front of the bus was about 75 feet south of the Augusta-Pulaski intersection, a female passenger informed him that there was a woman alongside the bus. The defendant Mokate then heard a thump on the right side of the bus near the middle exit door. He thereupon stopped the bus 75 feet from the crosswalk, departed from the vehicle and observed the plaintiff, whose head and nose were bleeding, sitting at the curb near the right rear corner of the bus. After an unsuccessful attempt to converse with the plaintiff, the defendant Mokate telephoned his supervisor who, in turn, sent out a supervisor (Stanley Leck) as well as called the police and an ambulance.

Upon the arrival of the police, the defendant Mokate informed them about the controverted incident. Subsequent to testifying that he never told the police that the traffic light changed while he was in the intersection, the trial judge (1) ordered a recess due to the plaintiff's crying at the witness table for 15 minutes and (2) instructed counsel for both sides to meet with him in chambers. During such meeting, defense counsel renewed his motion for a mistrial which the trial court denied. Moreover, when the direct examination of the defendant Mokate resumed, another unsuccessful motion for a mistrial was made by defense counsel on the basis that the plaintiff was removed from the courtroom by her attorney without any explanation to the jury.

The final bit of testimony offered to the jury by the defendants was contained in the evidence deposition of Mary Sebastian, a passenger on the bus involved in the incident. She testified that she was sitting in the first front seat across from the driver when the bus stopped for a red light at the Augusta-Pulaski intersection. As the bus started to cross Augusta Boulevard, she looked out of the window and saw the plaintiff walking eastward in a very unsteady manner. She continued to observe the plaintiff and started to scream when it appeared that the latter tripped or lurched up against the bus. However, even though she stated that she saw the plaintiff sitting on the curb in the crosswalk when she alighted from

the bus, she related that she did not see nor hear any contact between the bus and the plaintiff. Moreover, on cross-examination, Mary Sebastian stated that she did not see the plaintiff fall, trip, or step off the curb. She was also unable to ascertain the point of impact between the bus and the plaintiff.

At the close of all the evidence, defense counsel made a motion for a directed verdict on the grounds that the defendants were not negligent and the plaintiff was contributorily negligent. Besides denying this motion, the trial court also rejected defense counsel's renewed request for a mistrial due to the plaintiff's absence from the courtroom. Both counsels then presented their respective closing arguments and the cause was submitted to the jury. On May 21, 1974, the jury not only returned a verdict for the plaintiff in the amount of $75,000 but also responded in the negative to the defendants' special interrogatory concerning whether the plaintiff was guilty of contributory negligence. A judgment on the verdict was entered by the trial court on May 22, 1974. Subsequent to the trial court denying the defendants' post-trial motion for a judgment notwithstanding the verdict or, in the alternative, a new trial, a notice of appeal was filed on October 1, 1974.

We first consider the defendants' contention that the verdict and judgment are against the manifest weight of the evidence. In support of such position, the defendants argue that the plaintiff failed to sustain her burden of proof since she was her only occurrence witness and her testimony was not only contradicted by the defendant Mokate and Mary Sebastian, but it was improbable in two respects. First, it is unlikely that the bus could have hit the plaintiff who had taken only three steps into the street, when it had to traverse a quarter of a block and the width of an intersection. Secondly, it is stressed that if the plaintiff was struck by the front of the bus and knocked forward, as she so testified, she could not have been found at the rear of the bus without such vehicle running over her. Although we do not controvert the defendants' premise that the plaintiff must prove by a preponderance of the evidence the respective elements comprising the tort of negligence, we believe that neither of the two assumptions proffered in support of the initial basis of review warrant a result contrary to the one enunciated by the trial court.

■■ In ascertaining whether a verdict is against the manifest weight of the evidence, it has been held that a verdict will not be disturbed on review merely because (1) the jury could have found differently or (2) the judges feel that other conclusions would be more reasonable. (*E.g., Purdom v. Swanson* 130 Ill. App. 2d 549, 552, 263 N.E.2d 883, 885; *Vasic v. Chicago Transit Authority*, 33 Ill. App. 2d 11, 11e, 180 N.E.2d 347, 350.) Rather, in order to set aside a verdict on the basis of it being against the

manifest weight of the evidence, an opposite conclusion must be clearly evident or the jury's verdict must be palpably erroneous and wholly unwarranted. (*E.g., Walters v. Taylor*, 36 Ill. App. 3d 934, 939, 344 N.E.2d 765, 769; *Huston v. Chicago Transit Authority*, 35 Ill. App. 3d 428, 432, 342 N.E.2d 190, 194.) Moreover, in reaching such a determination, reviewing courts not only consider the jury's verdict but also the fact that the trial judge, who saw and heard the witnesses as well as heard the arguments of both counsels, denied the defendant's post-trial motions. *E.g., Pozdro v. Dynowski*, 83 Ill. App. 2d 79, 87, 226 N.E.2d 377, 381; *Tihay v. Aurora City Lines*, 79 Ill. App. 2d 107, 113, 223 N.E.2d 171, 173-74.

Applying these legal precepts to the case at bar, it is apparent that there is no propriety to the defendants' contention. As the record evinced, there was a substantial conflict in the testimony at trial concerning the manner in which the accident occurred. On one hand, the plaintiff testified that the front of the bus hit her after she had taken three steps within the pedestrian crosswalk. In contradistinction to such account, the defendants rely on (1) the testimony of the defendant Mokate that he did not see the plaintiff at any time before the accident occurred and (2) the evidence deposition of Mary Sebastian wherein she stated that it appeared the plaintiff tripped or lurched up against the bus. Such controverted evidence raises a substantial question of fact and since different inferences could be drawn from either side's version of how the incident occurred, the determination of what actually transpired on November 3, 1969, depended upon the jury's evaluation of the credibility of the witnesses called to testify. Based on their actual observation of the witnesses and their manner of testifying the jury chose to believe the plaintiff. While we can only surmise on what facts, conclusions and inferences it relied on in reaching its verdict, we believe that in light of the following reasoning, a contrary conclusion was not clearly evident nor was the jury's verdict palpably erroneous and wholly unwarranted.

In the first place, the plaintiff's version of the manner in which the accident occurred was not so improbable as the defendants so contend. With regard to their initial assault of her testimony concerning the relative distances the parties had to cover before there was contact between the bus and the plaintiff, we believe that the defendants' assumption is based only on a portion of their adversary's testimony, namely, that when she first saw the bus, it was a quarter of a block north of Augusta Boulevard on Pulaski Road. Taking into consideration such other factors as (1) the possible effect the plaintiff's age (71) had on the briskness of her walking speed and (2) the amount of time that had elapsed before the traffic signal turned green so as to allow her to cross the intersection, we are of the opinion that the jury could have concluded that the C.T.A.'s bus could

very likely have transversed a quarter of a block from the time plaintiff saw the bus and had taken only three steps into the Augusta-Pulaski intersection.

We also believe that the mere fact that the plaintiff was found at the rear of the bus without such vehicle running over her does not jeopardize the plausibility of her testimony that she was struck by the front of the bus. While the defendants solely rely on the testimony of the defendant Mokate and Mary Sebastian that the point of impact was approximately the middle right side of the bus, it is important to note that neither individuals saw the contact between the bus and the plaintiff. Moreover, in light of the plaintiff's persistence during cross-examination by defense counsel that the front of the bus struck her and knocked her down in the street, we are inclined to believe that the jury could conclude that by virtue of either (1) the angle at which the plaintiff was propelled by the force of the impact or (2) sheer chance, she was struck by the right front of the bus and knocked to the side as such vehicle proceeded past her.

Besides the untenability of the defendants' analysis of the plaintiff's testimony, the inconsistencies and self-contradictions inherent in the testimony of their two occurrence witnesses, namely the defendant Mokate and Mary Sebastian, could have also cast doubt in the mind of the jury as to the plausibility of the defendants' version of what transpired on November 3, 1969. As far as the defendant Mokate is concerned, his testimony at trial concerning (1) where the plaintiff was situated following the incident and (2) the color of the traffic signal when he entered the Augusta-Pulaski intersection was directly refuted by two defense witnesses who arrived at such location shortly after the accident as well as his own testimony given at a deposition. While the defendant Mokate maintained at trial that when he stopped his bus about 75 feet south of Augusta Boulevard and got out of said vehicle, he observed the plaintiff sitting at the curb at the right rear corner of the bus, such statement was contradicted by Jim Petrecca and Stanley Leck. Mr. Petrecca testified that when he arrived at the scene of the incident, the plaintiff was on her knees in the street about two feet east of the west curb of Pulaski Road and approximately on the north line of the south crosswalk. He further related that the rear of the C.T.A.'s bus was 50 to 60 feet south of the crosswalk. Moreover, Mr. Leck indicated that when he arrived, (1) the plaintiff was seated on the sidewalk at the west curb of Pulaski Road about eight feet south of the south curb of Augusta Boulevard and (2) the rear of the bus was 50 feet south of Augusta Boulevard.

In addition to this disparity as to the location of the plaintiff after the accident, there was also inconsistencies in the defendant Mokate's own testimony regarding the color of the traffic signal when he entered the Augusta-Pulaski intersection. Although he maintained on direct

examination that the bus entered the intersection on a green traffic signal, it was brought out on cross-examination by the plaintiff's counsel that in his discovery deposition, he unequivocally responded to three different questions by stating that the light governing southbound traffic on Pulaski Road was red or against him when he entered the intersection. Moreover, on redirect by his own counsel, he acknowledged his remembrance of his affirmative responses at the deposition to the questions, posed not only by the plaintiff's attorney but his own counsel, concerning whether the traffic light was red when he entered the intersection. Thus, even though the defendant Mokate later stated on redirect that he had misunderstood one of these questions, it was within the province of the jury to weigh this misunderstanding and the inferences therefrom against the respective admissions and confirmations in his testimony at his deposition and at trial before an assessment of his credibility was reached.

With reference to the defendants' attempt to prove that the plaintiff actually caused the incident, emphasis is placed on the evidence deposition of Mary Sebastian wherein she tesified that it "looked like" the plaintiff lurched or tripped into the right side of the bus. However, a perusal of her testimony indicates that she did not see the plaintiff trip, fall, or even step off the curb. She further stated that she really did not know what happened on the day in question and that she did not see nor hear the impact between the plaintiff and the C.T.A.'s bus. We therefore believe that Mary Sebastian's testimony regarding her observation of the incident could have been construed by the jury to be riddled with speculation and conjecture and, coupled with the flaws inherent in the testimony of the defendant Mokate, was not sufficient for us to conclude that the verdict and judgment was contrary to the manifest weight of the evidence.

We are also of the opinion that the verdict and judgment were not the result of sympathy for the plaintiff. Although the defendants stress that the mere fact that the plaintiff was 71 years old and blind, would, in itself, induce sympathy, they contend that the prevailing factor eliciting the jury's sympathy, occurred when the plaintiff, during her cross-examination as well as the direct examination of the defendant Mokate in which she was thereafter escorted by her attorney from the courtroom, broke down and started crying. While defense counsel respectively proffered timely motions for a mistrial on the basis of the plaintiff's emotional outbursts and her absence from the courtroom, we believe that in view of the circumstances at bar, a mistrial was not warranted and the trial court properly denied such requests.

■■ It has uniformly been held in this State that emotional outbursts or other demonstrations by a party to a personal injury action do not constitute grounds for a mistrial where (1) such conduct was neither

intentional, simulated, nor improperly motivated and (2) its effect or impact is not so prejudicial as to have an unquestioned influence upon the jury's ability to try the issues fairly. (*E.g., Buckler v. Sinclair Refining Co.,* 68 Ill. App. 2d 283, 295, 216 N.E.2d 14, 20; *Blachek v. City Ice & Fuel Co.,* 311 Ill. App. 1, 23, 35 N.E.2d 416, 426; *cf. Bauer v. Timucci,* 33 Ill. App. 3d 1051, 1058, 339 N.E.2d 434, 439-40; *Creek v. Naylor,* 309 Ill. App. 601, 608-09, 33 N.E.2d 740, 744.) Moreover, the determination of whether a party's conduct falls within this bifurcated test for a mistrial rests within the sound discretion of the trial judge and, in the absence of apparent error, such determination will not be reversed on appeal. *E.g., Buckler v. Sinclair Refining Co.,* 68 Ill. App. 2d 283, 295, 216 N.E.2d 14, 20; *cf. Menolascino v. Superior Felt & Bedding Co.,* 313 Ill. App. 557, 576, 40 N.E.2d 813, 821-22.

■■ Considering such tenets in terms of the case at bar, we believe that the trial court did not abuse its discretion in not granting the defendants' various motions for a mistrial. As the record revealed, there was nothing intentional nor simulated to the plaintiff's emotional outbursts. Rather, since these reactions occurred during the respective examinations conducted by defense counsel, the plaintiff had no way of knowing in advance what posture or technique would be employed to elicit testimony from herself on cross-examination of the defendant Mokate on direct examination. Moreover, the fact that (1) *the trial court* insisted on the removal of the plaintiff from the courtroom specifically to avoid any prejudicial effect her crying might have on the jury and (2) she was not removed from the courtroom in the jury's presence dispells the defendants' assertion that her unexplained absence from the courtroom warranted a mistrial. Further, additional safeguards to avert the possibility of a verdict being based on something other than the evidence presented at trial were furnished at the conclusion of the evidence when the trial court expressly instructed the jury that (1) neither sympathy nor prejudice should influence their decision and (2) a corporate defendant is entitled to the same fair and unprejudiced treatment as an individual defendant would be under like circumstances. Therefore, based on the above reasoning, we are of the opinion that the plaintiff's emotional outbursts were spontaneous and unintentional and did not have such a prejudicial impact or effect on the jury so as to influence the outcome of this case.

It is next contended that the finding of the jury on the special interrogatory that the plaintiff was not contributorily negligent is contrary to law and fact. To buttress such assertion, the defendants contend that the plaintiff not only failed to sustain her burden of proving freedom from contributory negligence but that she failed to introduce any evidence negating such requisite element. We are not in accord.

It is well established that the answer of a jury to a special interrogatory concerning a plaintiff's contributory negligence will prevail on appeal unless it is contrary to the manifest weight of the evidence. (*E.g., Ruggiero v. Public Taxi Service, Inc.*, 16 Ill. App. 3d 754, 760, 306 N.E.2d 567, 571; *Pasko v. Commonwealth Edison Co.*, 14 Ill. App. 3d 481, 491, 302 N.E.2d 642, 650.) Consistent with our resolution of the defendants' initial basis of review, we believe that the answer to the special interrogatory should not be disturbed on appeal. While it is uncontroverted that in establishing a case of negligence, the onus is on the plaintiff to prove, among other elements, his or her freedom from contributory negligence as well as the defendant's negligence, we are of the opinion that the evidence at bar was sufficient for the jury to conclude that the plaintiff sustained her burden of proof.

■■ With regard to the plaintiff's lack of contributory negligence, the jury could have found from the evidence that when the plaintiff arrived at the southwest corner of the Augusta-Pulaski intersection, she (1) initially stopped for a red traffic signal, (2) observed the C.T.A.'s bus approximately one quarter of a block north of the intersection, and (3) carefully proceeded walking across the street within the pedestrian crosswalk only after signal had turned green in her favor. Moreover, the defendants' negligence could also be inferred from the inconsistencies and self-refutations in the respective testimony of the defendant Mokate and Mary Sebastian concerning (1) the color of the traffic signal when the bus entered the intersection, (2) the location of the plaintiff in reference to the bus following the incident, and (3) whether the plaintiff lurched or tripped into the bus. Thus, in light of the reasonable conclusions the jury could have drawn from such evidence, we cannot say that jury's answer to the special interrogatory was palpably erroneous and wholly unwarranted so as to merit a contrary result.

The defendants' final contention is that even if they are subject to liability for the plaintiff's injuries, the amount awarded her was patently excessive because the assessment of damages bore no relationship to the injuries proven, but were the result of sympathy for the plaintiff. To substantiate such assertion the defendants maintain that since the plaintiff lost her sight a considerable period of time after the accident and the medical experts who testified at trial were not decisive as to the cause of her blindness, she failed to establish that the accident was the proximate cause of her blindness. Assuming the plausibility of such position, they further posit that the other injuries sustained by the plaintiff were not sufficient to support a judgment of $75,000. We are not persuaded by either contention.

■■ It is generally recognized that the assessment of damages in a personal injury case is the preeminent function of the jury and such award

will not be overturned on review unless the jury is not correctly instructed as to the elements measuring damages and the size of the verdict is the result of either passion or prejudice or the jury having overlooked an element of damages. (*E.g., Huston v. Chicago Transit Authority*, 35 Ill. App. 3d 428, 434, 342 N.E.2d 190, 195-96; *Ward v. Chicago Transit Authority*, 52 Ill. App. 2d 172, 176, 201 N.E.2d 750, 752.) Moreover, in determining on appeal whether a disputed verdict is the result of passion or prejudice or a clear oversight by the jury, emphasis is not placed solely on the specific medical expenses incurred by the injured claimant. (*Orlandi v. Caraway*, 9 Ill. App. 3d 628, 632, 293 N.E.2d 337, 339.) Rather, consideration should be given to (1) all of the testimony surrounding the claimed items of damage (*Altman v. Gregg*, 11 Ill. App. 3d 751, 298 N.E.2d 288 (abstract opinion) as well as (2) whether the trial judge, who saw and heard all that took place at trial, approved the verdict. *E.g., Orlandi v. Caraway*, 9 Ill. App. 3d 628, 632, 293 N.E.2d 337, 339; *Ward v. Chicago Transit Authority*, 52 Ill. App. 2d 172, 176, 201 N.E.2d 750, 752; compare *House v. Stocker*, 34 Ill. App. 3d 740, 751, 340 N.E.2d 563, 571.

While we are cognizant of the difficulty in arriving at a precise dollar value of compensation for personal injuries, we believe that in light of the above legal tenets, the amount awarded by the jury was not excessive. As revealed in the record, the trial court correctly instructed the jury as to the elements measuring damage. Moreover, considering the entire testimony elicited at trial regarding the plaintiff's vision before and after the incident, there was ample evidence for the jury to conclude that the trauma emanating from the November 3, 1969, accident proximately caused her blindness.

It is undisputed by the defendants that prior to the incident, the plaintiff's eyesight was good and that she was steadily employed at a rubber company where she would trim rubber tubes with an electrical blade and then inspect them prior to packaging. While the defendants rely on the respective testimony of the plaintiff's physician who treated her for the injuries to her face, shoulder, leg and ankle while she was in the hospital, her neighbor with whom the plaintiff stayed for two weeks after her release from the hospital, and a current judge who, as former attorney for the C.T.A., took the plaintiff's deposition on March 30, 1971, concerning their inability to notice anything wrong with the plaintiff's eyesight, the record is replete with other evidence showing the absence of a time lag between the accident and the onset of the plaintiff's blindness.

Contrary to the testimony of the above individuals, the plaintiff testified that when the swelling in the front of her eyes had subsided after being in the hospital for two weeks, she could only see shadows. Besides bringing this to the attention of her treating physician a day or two after entering the hospital, she also asked to see Doctor Paul Carelli, an eye, ear and nose specialist, because of the difficulty with her vision. Moreover,

her attending physician admitted on re-cross-examination to having seen a report from a hospital record prepared by an intern on November 3, 1969, wherein it was noted that the plaintiff had a hemorrhage in the right eye and could not see. Although the treating physician presumed that the reason behind the plaintiff's inability to see was attributable to the swelling emanating from the accident, he did admit that on the day before the plaintiff was discharged, (1) she did inform him that she was having trouble with her eyes for some time and (2) since he himself had previously found a hemorrhage in the plaintiff's right eye, he recommended that she see Doctor Carelli.

■■ In contradistinction to the defendants' other contention, we do not believe that the testimony elicited from the plaintiff's two medical experts, namely, Doctor Carelli and Doctor Harold Feinhandler, an ophthalmologist, was such as to evince to the jury their indecisiveness regarding the cause of the plaintiff's blindness. As the record indicated, on May 4, 1970, Doctor Carelli examined the plaintiff and even though he was unable to see the retina in her left eye because the internal fluid of that eye was too hazy, he did discover a retinal detachment in her right eye which resulted in her inability to see from that eye. Thereafter, on January 28, 1974, and again on March 26, 1974, the plaintiff was examined by Doctor Feinhandler, who found that as a result of a retinal detachment in her left eye, the plaintiff was blind in such eye. While we do not controvert the fact that these expert witnesses examined the plaintiff on different occasions and discovered retinal detachments in different eyes, we more importantly note that both doctors (1) concurred that of all the possible causes of retinal detachment, the only one present in the instant case was the plaintiff's trauma and (2) opined that based upon a reasonable degree of medical and surgical certainty, the trauma of November 3, 1969, might or could have caused the detachment of the respective eye. Thus, in light of the evidence refuting the defendants' position concerning the substantial disparity in time between the plaintiff's accident and her blindness as well as that the medical experts' responses were not based on mere conjecture nor speculation, but on their examinations of the plaintiff and their knowledge of the nature of her condition, we believe that the jury could have found that the trauma incurred by the plaintiff following her encounter with the C.T.A.'s bus was the proximate cause of her blindness. We therefore conclude that the jury's verdict, which the trial judge approved, was not so out of proportion to the injuries sustained at bar so as to demonstrate sympathy for the plaintiff.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

JOHNSON, P. J., and DIERINGER, J., concur.