EDWARD H. TRAUSCHT, Plaintiff and Counterdefendant-Appellee, v. SHARON GUNKEL, Defendant and Counterplaintiff-Appellant.

First District (4th Division)    No. 76-1650

Opinion filed March 16, 1978.—Rehearing denied April 13, 1978.

A. Denison Weaver, Ltd., of Chicago, for appellant.

John R. Casey, of Oak Lawn, and Van Duzer, Gershon, Jordan & Petersen, of Chicago (Horace W. Jordan, of counsel), for appellee.

Mr. JUSTICE ROMITI delivered the opinion of the court:

The defendant-counterplaintiff appeals from an adverse verdict in an automobile accident case. The issues before this court are (1) whether the trial court erred in giving the *Prim* instruction to the jury before it retired and if so whether the error warrants reversal although no prejudice is alleged and (2) whether the jury determination was against the manifest weight of the evidence where the only·material witnesses were the investigating officer and two reconstruction experts. We find no error and affirm.

The accident in question occurred on a lonely road in an unincorporated area of Cook County at about 1:30 a.m. on September 12, 1972. The street in question is a two-lane bituminous highway running east and west. At the time of the accident the defendant's car was traveling east and that of the plaintiff's decedent, Trauscht, was traveling west. The major question in this case was which car crossed the center line.

Because Trauscht had died, the defendant Gunkel was barred by the Dead Man's Act (Ill. Rev. Stat. 1975, ch. 51, par. 2), from testifying. There

was one passenger (Thompson) in Trauscht's car but he testified that he had fallen asleep before the accident and remembered nothing about the accident. Thompson testified that he had worked from 12 noon that day until 12 midnight at his gas station. Trauscht, on the other hand, who had been an employee of his, had worked from 3 in the afternoon until midnight. Afterwards they went in Trauscht's car to a restaurant where they ate. They then drove towards a stable located at 159th and Wolf Road. It was on the way there that the accident occurred.

Police officer Harrison, one of the investigating officers, then testified for the plaintiff. At the time of the trial he had been a sheriff's police officer for about 6 years and had investigated about 500 accidents. He arrived at the scene of the accident at about 1:35 a.m. At that time there was no rain and it was clear. Several other official automobiles also arrived at the scene and the light from their headlights, which were left on, enabled him to see the roadway between the two vehicles. At this time he remained at the scene for about one-half hour and walked across the road several times. There was debris from the cars, dirt which had been knocked off upon impact and parts of trim scattered through the roadway down the center line; the main deposit of debris started near Trauscht's car. There was also sediment along the center of the highway. He saw no skid marks. The only oil accumulation which he observed was that which was emitting from the bottom of Trauscht's car which was off on the north side of the road. (Gunkel's car ended up off on the south side of the road.) He found no other accumulation of oil in the eastbound or westbound lanes, and the roadway was sufficiently lighted so that he could have seen any accumulation if there had been any. He did not walk in any oil. After leaving the scene to go to the hospital, he returned. By that time it had started to mist and rain. He had in his 6 years of investigation seen oil on a wet pavement. He did not see any condition of oil and water in the eastbound lane.

The police photographs of the accident scene, which had been taken after ambulance and rescue teams had left, were then introduced into evidence. On cross-examination Harrison agreed that one of the photographs showed a headlight or mirror in the eastbound lane although he did not remember seeing any. He also agreed that the photograph showed some type of tire marks or tire scrapings which appeared to run diagonally across the eastbound lane pointing towards Trauscht's car although he did not remember seeing them at the time. They also showed two scratch marks in that lane which he did not recall seeing. He did not agree with the defendant's contention that the black mark in the picture was an oil mark. He stated it was probably dirt on top of the tar with which the street is patched. He also stated that he did not remember seeing the oil spatter which appeared in the defendant's pictures, taken

several days later, on the road when he investigated. He also stated that the reason he had not shown any gravel across the road in a diagram he had made at the time was because it was not there at that time; it was thrown on the road by the other vehicles. Finally, he testified that he did not know on which side of the road the impact occurred.

Willard Alroth testified as a reconstruction expert for the plaintiff. He first visited the scene 6 days after the accident. He had the police photographs of the accident with him at the time which he examined on the scene. To a general extent, he attempted to correlate the photographs he took with the police photographs. He testified that at the scene he observed a large and rather dispersed area of gouging in the westbound lane and some relatively deep gouge marks 2 or 3 feet north of the center line. There was also a fluid stain closer to the north edge of the road. This stain was just west of some of the gouge marks. This stain appeared in the police photographs. He also found a fluid stain in the eastbound lane but this stain did not appear in the police photographs. The same is true of a rubber tire scuff mark leading from the center line northwest. Besides the oil stain, he also observed pavement gouges in the eastbound lane. There were also furrows made by both cars as they went off the road. Alroth also inspected both automobiles. The decedent's automobile was a 1964 Mercury Montclair, 4-door sedan which weighed between 4300-4500 pounds. The defendant's was a 1968 Oldsmobile Cutlass, 2-door hardtop which could have weighed between 3600-3800 pounds. The entire front end of the Oldsmobile was involved in the direct contact of the collision. Even the right front fender was pulled about 34 inches to the left. The left front frame was bent down and would have been dragging on the ground after the accident. There was little actual side penetration. The main contact on the Mercury was "a limit of main force beginning at about 15 inches from the left side." It extended back along the left side. There was direct contact damage all the way back into the rear fender area. By the nature of the left side collapse the right side was twisted around toward the left. The left side frame was down on the ground.

Alroth did not check to see if any oil vessels of either vehicle had been fractured. Taking measurements, he determined that the front of the Mercury came to rest about 3 feet north of the roadway and the rear about 10-15 feet—the car facing southwest. The Oldsmobile's right front was about 20 feet from the south edge of the road and the right rear was about 25 feet. It was angled somewhat to the northwest facing west. The distance between the vehicles was about 220 feet. He concluded from all his observations that when the collision occurred the decedent's car was traveling straight in the westbound lane about 3-4 feet from the center lane and that the defendant's car was angled slightly to the northeast and straddling the center line, the two vehicles colliding at a point relatively

near and related to the large area of gouge marks in the westbound lane near the Mercury's final resting position. The Oldsmobile had the greater momentum at impact. After impact the Oldsmobile moved in a southeasterly direction rotating and sliding off the road; in effect it spun alongside the Mercury and finally spun around and moved backwards. The Mercury rotated counterclockwise about 45 degrees and moved generally in a 45-degree angle off onto the north shoulder of the roadway.

On cross-examination, the witness conceded that if the fluid stains in the eastbound lane were caused by the accident, this would be another factor that would have to be considered and in correlation with other events it might cause him to change his opinion.

James Baker testified as reconstruction expert for the defendant. He first visited the scene on September 23, 1972. He did not have the police photographs with him at the time nor had he seen them before his visit. (He did eventually obtain some police photographs but there was no testimony as to whether he used them in reaching his conclusions.) He observed a gouge about a foot and one half long on the center line, a scratch in the eastbound lane several feet long and two heavy gouges in that lane in the end of an oil spatter. He was surprised at finding the oil spatter so dark 9 days (actually 11 days) after the accident. The two gouges in the oil spatter could have been made by parts of the transmission or the crank case. There was also a tire scuff which went across the lane toward the final position of the Mercury. He also observed the furrows leading to the Oldsmobile's final position.

After viewing the scene, the witness inspected the two automobiles. The left side of the Mercury showed a remarkable degree of force from the front almost to the rear. The deepest penetration was just behind the left front wheel. This indicated the direction of force was from the front to the rear and in from the side. The maximum engagement on the Oldsmobile was the front of the left wheel. The thrust against it did not come from straight ahead but at an angle. He observed that the transmission case on the Mercury was not hit but that that on the Oldsmobile was broken down.

He concluded that the first contact between the vehicles was approximately in the center of the eastbound lane, 4 or 5 feet west of the heavy gouges in the oil stained area. During engagement, the underside of the transmission and engine were broken open to the point where parts were missing. The force of the Oldsmobile on the road would have left heavy gouges in the surface of the road and the oil in the transmission case and the engine would have been forcibly dumped on the road surface at this point. This was his main reason for believing that the collision took place at that point. Furthermore, the general position of the vehicles to each side and the final position confirmed this. As the Oldsmobile after

the collision moved toward the right side it would have kicked up a lot of roadside gravel and thrown it into the road. It then rotated into its final position off of the road.

The witness further concluded that the accident could not have occurred in the westbound lane. For the Oldsmobile to have collided at that angle, it would have had to have been moving at an extremely high speed so that it stopped the Mercury and still went 200 feet. If it had done so both cars would have ended up on the north side of the road.

On cross-examination Baker agreed that if anyone had walked through the oil which was spilled, he would know it.

There was testimony that both parties were careful drivers. There was also evidence as to the defendant's injuries (since she was also a counterplaintiff) and as to the deceased's activities. The jury returned a verdict for the plaintiff and against the defendant for $45,000.

I.

While the appellant does claim that the verdict is against the manifest weight of the evidence, she has only raised one allegation of trial error— the giving of the *Prim* instruction with the other instructions just prior to the jury's retiring to deliberate. The appellant contends that the instruction should not have been given since it was complex, ambiguous, peremptory and coercive and there is an appropriate IPI instruction, and that it should not have been given as part of the original series of instructions contrary to the Illinois Pattern Jury Instructions, Civil No. 1.05 (2d ed. 1971), Notes on Use, which provide that such instruction should only be given when it appears the jury is deadlocked. We will consider this contention first.

● 1    At the end of the trial, the judge *sua sponte*, over the objections of the attorneys for both parties, gave the jury the so-called *Prim* instruction along with the other instructions in the case. The objections by the parties to the *Prim* instructions were on the grounds it was not IPI; it was argumentative; it used the word "convinced"; and it incorrectly set forth the law. There was no objection to the timing of the instruction, *i.e.*, that it should not be given with the other instructions but later, if a deadlock should occur. Accordingly that objection is waived. Compare *Allen v. Howard Bowl, Inc.* (1965), 61 Ill. App. 2d 314, 210 N.E.2d 342.

The defendant's contention that the *Prim* instruction was complex, ambiguous, peremptory and coercive was answered by our supreme court in *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731, when it mandated the use of that instruction in cases where the trial court is faced with a deadlocked jury and needs no additional discussion here. Even, however,

if it were error to give the *Prim* instruction instead of IPI Civil No. 1.05 or to give it along with the other instructions, the appellant has in no way suggested that it was prejudiced by the giving of the instruction. The appellant argues, rather, that if we do not reverse a court which gives a non-IPI instruction in lieu of an IPI instruction, the courts will be encouraged to substitute their own judgment and disregard the IPI. But it is not the practice in Illinois to reverse for mere technical error. This is not a game of chess where the rules may be all important. The question before a reviewing court when error is alleged always is whether the complaining party received a just and fair trial, not whether the game was played without the slightest deviation from the rules. (*Fraider v. Hannah* (1949), 338 Ill. App. 440, 87 N.E.2d 795; *People v. Agnello* (1961), 22 Ill. 2d 352, 176 N.E.2d 788, *cert. denied* (1962), 368 U.S. 957, 7 L. Ed. 2d 389, 82 S. Ct. 400.) Indeed, it rarely happens that in a long and hard fought case some minor error does not creep in. (*People v. Agnello* (1961), 22 Ill. 2d 352, 176 N.E.2d 788, *cert. denied* (1962), 368 U.S. 957, 7 L. Ed. 2d 389, 82 S. Ct. 400.) Before the court will reverse because some error is committed, that error must have been prejudicial. 3 Ill. L. & Prac. *Appeal and Error* §801 (1953).

■■ We find *Hoffman v. Wilson* (1965), 60 Ill. App. 2d 396, 208 N.E.2d 607, *appeal denied* (1965), 32 Ill. 2d 627, to be persuasive here. In that case the judge, upon being informed the jury was deadlocked, made certain statements to it instead of giving IPI Civil No. 1.05. Appellant there argued that the remarks of the court might have had a coercive effect, the same argument which counsel makes here. The court there simply answered, as we do also that "Counsel does not set forth just how the trial judge's remarks might have coerced the jury, and, since he did not speculate, we surely are in no position to do so." 60 Ill. App. 2d 396, 407, 208 N.E.2d 607, 611.

## II.

■■ The appellant's other contention on appeal is that the jury verdict was against the manifest weight of the evidence. In reviewing this contention we must bear in mind that the defendant has in no way suggested that any error in the admission or rejection of evidence or any misconduct by plaintiff's attorney led to an improper verdict. We must also bear in mind the well established Illinois rule that:

> "It is not the function of the reviewing court to substitute its judgment for that of the jury upon controverted questions of fact. It is fundamental law in our jurisprudence that all controverted questions of fact, in a jury trial, must be submitted to the jury for decision. This is primarily the exclusive function of the jury, and to withdraw such questions from its consideration is to usurp its

function." (*Geraghty v. Burr Oak Lanes, Inc.* (1955), 5 Ill. 2d 153, 163-64, 125 N.E.2d 47, 53.)

Furthermore:

> "A verdict will not be set aside merely because the jury could have found differently or because judges feel that other conclusions would be more reasonable. (*Lindroth v. Walgreen Co.*, 407 Ill. 121.) In the trial of a law suit, questions of one's due care, another party's alleged negligence and the proximate cause of such injured party's injuries and damages are pre-eminently questions of fact for a jury's determination. Under our system of jurisprudence, jury determinations can be set aside only when a court of review, or a trial court upon proper motion, is clearly satisfied that they were occasioned by passion or prejudice or found to be wholly unwarranted from the manifest weight of the evidence. We think the trial court properly overruled defendant's motion for judgment notwithstanding the verdict, and that the Appellate Court erred in deciding otherwise." (*Kahn v. James Burton Co.* (1955), 5 Ill. 2d 614, 623, 126 N.E.2d 836, 841.)

When an appeal is taken on the ground that the judgment is against the manifest weight of the evidence, it is not sufficient to show that there is sufficient evidence to support a contrary judgment. To be successful the evidence in behalf of the party prosecuting the appeal must be so strong and convincing as to completely overcome the evidence existing in favor of the opposing party. (*Broncata v. Timbercrest Estates, Inc.* (1968), 100 Ill. App. 2d 49, 241 N.E.2d 569; *People ex rel. Lauth v. Wilmington Coal Co.* (1949), 402 Ill. 161, 83 N.E.2d 741; *People ex rel. Dizney* (1975), 26 Ill. App. 3d 45, 324 N.E.2d 433.) In considering this question, the court must consider all the evidence in its aspects most favorable to the appellee (*Hall v. Kirk* (1973), 13 Ill. App. 3d 656, 300 N.E.2d 600), and if there is evidence which, if believed, would support the verdict, this court should not interfere with the result. (*Nowakowski v. Hoppe Tire Co.* (1976), 39 Ill. App. 3d 155, 349 N.E.2d 578.) We cannot substitute our judgment for that of the jury where that would require us to elect between conflicting evidences and inferences. (*Prostko v. Willstead* (1966), 75 Ill. App. 2d 477, 220 N.E.2d 751.) And, in making our determination we must not only consider the jury's verdict but also the fact that the trial judge who saw and heard the arguments of both counsel, denied the defendant's post-trial motions. *Costello v. Chicago Transit Authority* (1976), 40 Ill. App. 3d 461, 352 N.E.2d 417, *appeal denied* (1976), 64 Ill. 2d 595.

Normally, in the case of disagreement between two witnesses giving expert opinions, the preponderance of the testimony is a matter to be determined by the jury. (6 Callaghan's Illinois Evidence §18.26 (1964).) The appellant here argues that the testimony of appellee's expert witness

should not have been accepted by the jury since the witness in reaching his conclusions admittedly failed to consider the oil spatter and the two gouges lying in that oil spatter. The appellant, however, overlooks the fact that there was no proof that either resulted from the accident and was present immediately after the accident. To the contrary, the police officer testified that he saw no oil in the eastbound lane, and that he walked across the road several times and that he could have seen any accumulation if there had been any. Gunkel's own expert was surprised that the oil was so dark 9 days after the accident (in fact the interval was 11 days). The jury could have chosen to believe, with the police officer, that there was no oil in the eastbound lane after the accident and, therefore, could have chosen to reject the conclusion of Gunkel's expert who by his own statements saw the stain, saw the damage to the undercarriage and concluded that since the oil could have come from the Oldsmobile, that it did come from the Oldsmobile.

■■ Gunkel argues on appeal that the police photographs reveal the oil spatter. Since the photographs are not clear, their interpretation is for the jury and not for this court. Trauscht's expert witness did not believe the photographs showed any oil stain in the eastbound lane. We may note that while Baker, Gunkel's expert witness, testified that the spatter was found in one of the police photographs, that photograph being offered in evidence by the defendant,[1] counsel for Gunkel in the trial court apparently believed that the oil spatter was not shown in the police photographs since he asked Alroth, Trauscht's expert witness, on cross-examination: "Now, you told us that the police photographs don't show any oil spill, is that correct? * * * As a matter of fact, there were no photographs taken of that area, is that correct, at 2:00 in the morning on the night of the occurrence" and later "The mark would be in between those two photographs" or at least he could have given the jury that impression.

■■ Basically, Gunkel is unhappy because the jury chose to believe the appellee's expert witness rather than his own. But the jury could have chosen to reject Baker's testimony seemingly based solely on what he found at the scene eleven days after the accident, unassisted by police photographs taken immediately after the accident, and on the condition of the two automobiles, and could have chosen to believe the appellee's witness who used the police photographs as well as his own observations, who rejected for consideration an oil spatter not clearly shown in the police photographs and which the investigating police officer testified he

---

[1] In the abstract, appellant has Baker also testifying that he believed the stain appeared in a police photograph tendered in evidence by the plaintiff. That statement does not appear, however, on the specified page of the record and this court has been unable to find that statement anywhere in the record.

did not see there after the accident and who likewise, unlike Baker, did not apparently base his conclusions in part on a certain gravel spill which the police officer testified was thrown on the road by the other vehicles, not by the accident vehicles.

"There is, generally speaking, no rule of law which requires controlling effect or influence to be given to, and the court and jury are not required to accept in the place of their own judgments, the opinion testimony of expert witnesses, merely because of the special knowledge of the witnesses concerning the matters upon which they give their testimony. Expert opinions are not ordinarily conclusive in the sense that they must be accepted as true on the subject of their testimony, but are generally regarded as purely advisory in character; the jury may place whatever weight they choose upon such testimony and may reject it, if they find that it is inconsistent with the facts in the case or otherwise unreasonable. The weight given to expert testimony is for the trier of the facts, who is not required to give it controlling influence." 31 Am. Jur. 2d *Expert and Opinion Evidence* §183, at 748-49 (1967); *Hall v. Kirk* (1973), 13 Ill. App. 3d 656, 659, 300 N.E.2d 600, 602-03.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

JOHNSON, P. J., and LINN, J., concur.